[Cite as *In re R.P.*, 2018-Ohio-517.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: R.P. and E.P.

:
:
:          Appellate Case Nos. 27746 and 27747
:
:          Trial Court Case Nos. 2015-783 and
:          2015-784
:
:          (Appeal from Common Pleas Court-
:          Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of February, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
          Attorney for Appellee-Montgomery County Children Services Board

SEAN BRINKMAN, Atty. Reg. No. 0088253, 10 West Monument Avenue, Dayton, Ohio 45402
          Attorney for Appellant-M.R.

. . . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** In this case, Appellant, M.R. ("Mother") appeals from a judgment granting permanent custody of her minor children, E.P. and R.P., to Appellee, Montgomery County Children Services Board ("MCCS"). The children's father, R.P., Sr. ("Father") has not appealed.

**{¶ 2}** Mother contends that the trial court erred in finding that clear and convincing evidence supported the grant of permanent custody to MCCS. Mother further contends that a grant of permanent custody was erroneous because MCCS failed to make reasonable efforts to eliminate the children's removal from their home or to make it possible for the children to safely return home.

**{¶ 3}** We conclude that the trial court did not abuse its discretion by finding that a grant of permanent custody to MCCS was in the best interests of the minor children. The trial court's findings under R.C. 2151.414(D) and (E) were supported by competent, credible evidence. We further conclude that MCCS made reasonable efforts to reunify the family and prevent the continued removal of the children. Accordingly, the judgment of the trial court will be affirmed.

I.   Facts and Couse of Proceedings

**{¶ 4}** E.P. and R.P. are twins who were born three weeks prematurely in January 2015. The children were hospitalized for several weeks at Dayton Children's Hospital, during which time MCCS received a referral and investigated.

**{¶ 5}** On February 10, 2015, MCCS filed dependency complaints regarding both children, asking the juvenile court to award MCCS ex parte temporary custody due to the

fact that the children were scheduled to be released from the hospital.[1]   According to the complaints, Mother was unable to properly care for the children because she had extensive mental health problems.   Mother had been diagnosed with bipolar disorder, schizophrenia, and borderline personality disorder, had been hospitalized three years earlier for attempted suicide, and suffered from seizures.   The hospital reported that Mother had not consistently visited the children.   In addition, the maternal grandmother (M.K.), with whom Mother lived, also had learning disabilities, had cursed at hospital staff, and had refused to allow a caseworker inside her house to view what supplies were available for the children.[2]   Father was out of town working and had not visited the children.

{¶ 6} The trial court granted ex parte temporary custody to MCCS, and the twins were placed with the same foster family.   A shelter care hearing was held on February 11, 2015, at which time the court noted that Mother had mental health issues that needed to be addressed, and further noted that Father was in jail for domestic violence charges. The court appointed counsel for Mother; shortly thereafter, the court appointed a guardian ad litem (GAL) for the children.   In addition, the court appointed a GAL for Mother.

{¶ 7} An adjudicatory and dispositional hearing was held on April 24, 2015. Mother was present, but Father did not attend.   On April 24, 2015, the children's GAL filed a report, recommending that MCCS be granted temporary custody of the children.

---

[1] MCCS filed separate cases concerning the children, and the cases were consolidated. The facts pertaining to the children are essentially the same, other than that E.P. had more health issues and was released a few days after R.P.   We will refer to the docket for R.P. when a docket reference is necessary.

[2] While Mother and M.K. were not actually related, they lived together, and Mother referred to M.K. as her mother.

The GAL commented that Mother's mental issues were very apparent during her conversations with Mother.

{¶ 8} The GAL further noted that Mother and Father were currently living in a two-bedroom home with M.K., and M.K.'s boyfriend, D.B. The home was not suitable for children due to smoke (which would be detrimental to the children's respiratory problems), the lack of a place for the children to sleep, and the presence of two dogs and nine cats.

{¶ 9} Mother told the GAL that Father would not be present at the adjudicatory hearing because someone had to stay with the dogs or they would tear up the house. Mother's case plan included classes at Artemis because there had been domestic violence between the parents when Mother was pregnant. In addition, Father had been convicted of domestic violence.

{¶ 10} At the time the GAL filed her report, E.P. was in the hospital due to respiratory issues and would be released from the hospital on oxygen. The GAL had visited the foster home and found the foster mother to be very attentive.

{¶ 11} On May 15, 2015, the trial court filed a decision finding the children dependent and granting temporary custody to MCCS. The court also approved a case plan that set out various requirements, including that the parents participate in psychological evaluations and parenting assessments, complete parenting education classes, continue to participate in mental health services through Access Ohio and follow through with recommendations, participate in services to address domestic violence, and obtain and maintain stable housing with working utilities. The parents were also permitted to have supervised visitation at the agency once a week for two hours.

{¶ 12} In August 2015, MCCS filed a semiannual administrative review reporting

"some progress." Among other things, MCCS noted that Mother was unable to reside on her own due to her seizure condition and was living in a two-bedroom apartment with M.K. and D.B., who had an alcohol problem. Purportedly, the landlord was seeking a larger residence. Father had been residing in a homeless shelter since a second domestic violence incident (which occurred in May 2015), and was reportedly using alcohol. Mother had stated that she had applied for social security and that a hearing date was scheduled. MCCS expressed concern over Mother's mental health and cognitive ability to care for the newborn twins, who had been born premature. In addition MCCS expressed concern over Mother's housing situation and lack of income.

{¶ 13} In December 2015, MCCS filed a motion for a first extension of temporary custody. Mother was still living in the same housing situation and had no income. Father had moved back in the house despite two prior domestic violence incidents. The house also contained black mold. In addition, Mother had not followed through with case management services. Another semi-annual review was filed in January 2016, stating that insufficient progress had been made and that MCCS intended to file for permanent custody during the next review period, as neither parent had demonstrated stability and the children would be at risk of maltreatment if they were in their parents' care.

{¶ 14} In February 2016, the trial court granted a first extension of custody, based on a hearing held on February 8, 2016. Mother was present at the hearing, but Father did not appear. The decision noted that Mother had failed to respond to services because she had housing issues and had been unable to demonstrate parenting skills. A case plan was attached and contained the same objectives that had been previously outlined.

{¶ 15} In late June 2016, MCCS filed a motion asking the court to commit the children to the permanent custody of MCCS.   The motion noted the following facts; Mother visited the children twice a week at the agency, but visits were monitored due to her cognitive delays.   Mother and Father were still living with M.K. and D.B. in the small two-bedroom house.   M.K. had prior involvement with MCCS regarding her own biological children, and she also appeared to have cognitive and health issues.   Mother had not completed her case plan, and her psychological evaluator expressed serious concern over whether Mother would ever be able to safely parent her children.   Father also had not completed his case plan.   Finally, the children had numerous doctor's appointments to ensure they stayed healthy.   The case plan was amended subsequently to include a substance abuse assessment for Father because he had been arrested for public intoxication.

{¶ 16} Ultimately, a permanent custody hearing was held on September 22, 2016. The children's GAL filed a report the day of the hearing, recommending that MCCS be granted permanent custody of the children.   Among other things, the GAL noted that Mother had said for a year and a half that she was obtaining stable and secure housing. However, as of September 15, 2016, Mother was homeless and was residing in a shelter. Mother was not employed, although she had told the GAL that she had been approved for SSI and should be receiving payment very soon.   The GAL noted that Mother had been telling her this for a substantial period of time.

{¶ 17} Additionally, the GAL had serious concerns about the mental health of Mother and Father, due to the psychological evaluation done by Dr. Bromberg, which verified that Mother and Father were unable to provide the necessary care for the children.

The GAL mentioned other facts, including the parents' lack of attention to the children's safety during visitation, M.K.'s action in slapping one of the children at visitation, the children's continued medical concerns, and the fact that the children were doing well in their foster care placement.

{¶ 18} At the hearing held on September 22, 2016, both parents were present. MCCS presented testimony from the following witnesses: Dr. Bromberg, the psychologist who had evaluated both Mother and Father; Allene Anderson, the executive director of Celebrating Families of Children and Adults with Special Needs; Maggie Lupton, an MCCS employee who assessed Mother and Father at the visitation center; Cheryl Larcom, who was the MCCS caseworker from January through July 2015; C.K., the twins' foster mother; and Mary Locke, the MCCS caseworker from July 2015 through the date of the hearing. Mother and Father did not testify and did not present any witnesses or evidence at the hearing.

{¶ 19} Dr. Bromberg assessed Mother in May 2015. He could not give Mother a personality assessment inventory because the test had a fourth-grade reading requirement and Mother only demonstrated reading ability between the second and third grades. He was able to give Mother other tests, including an intelligence test, a substance abuse screening inventory, a Child Abuse Potential Inventory ("CAPI"), and an Axis II Personality Checklist. Dr. Bromberg calculated Mother's IQ at between 70 and 80 points, and found that she had three principal diagnoses: personality disordered behavior, mood disorder, and mild intellectual disability.

{¶ 20} On the CAPI, Mother had a quite high "lie" scale and a positive "faking good response" distortion index, which meant that her response tendency was to underreport

or minimize her psychological behavior and problems. The cut-off score for child abuse was 166, which means that a person over that score shows characteristics similar to known child abusers. Mother's score was 347, which was one of the highest scores Dr. Bromberg had ever seen, and was of real concern. Mother also had a score of 42 on the rigidity scale, while the cutoff score was 30. This meant that Mother's parenting principles tended to be rigidly enforced and suggested unrealistic expectations.

{¶ 21} According to Dr. Bromberg, a personality disorder is an enduring, serious and dysfunctional personality pattern and is most difficult to treat. Of 10 personality disorders, Mother had eight of 10 features (avoidant, obsessive-compulsive, schizoid, narcissistic, borderline, anti-social, histrionic, and dependent), while three were most predominant (schizoid, avoidant, and obsessive-compulsive). Mother's personality disorder would affect her parenting and make it very difficult, because every interaction with a child would be potentially dysfunctional. Mother's mood disorder indicated that her moods tended to be very reactive and unpredictable, and sometimes very extreme. Further, Mother's mild intellectual disability could affect her parenting in connection with basic knowledge, comprehension, and common sense.

{¶ 22} Dr. Bromberg also indicated that Mother heard voices that told her to hurt herself. She did take medicine to control this, but one thing associated with mood disorders is that people tend not to be compliant with taking medication. If Mother did not take her medication, she could hear negative things that were of high risk to her and could affect her parenting or cause her to hurt herself or the children.

{¶ 23} Among Dr. Bromberg's recommendations were as follows: Mother needed to continue to see her psychologist on at least a monthly basis; a doctor needed to monitor

her 19 medications to figure out the interactions and to ensure Mother remained compliant; Mother should have random drug testing due to suggestions on the substance abuse screening test; Mother should undergo dialectical behavior therapy ("DBT") weekly at a minimum, and for at least 24 months; Mother should complete life skills training; and she should complete anger management therapy, which could be incorporated into the DBT.

{¶ 24} Dr. Bromberg evaluated Father on April 21, 2016. Father was able to read and take all the tests. Father's personality assessment inventory was invalid because he responded to too many items that are not often endorsed. However, the answers Father did give were consistent with what Father said during his interview. Specifically, Father said that he had a temper and had trouble controlling his anger, that stress could really set him off, that he was suspicious of people, that he had some intense moods, and that his moods could shift quickly. Like Mother, Father was also diagnosed with personality disordered behavior, but his diagnosis was not as complicated. Father also had mood disorder, but based on the temper aspect, there was a diagnosis of intermittent explosive disorder. In addition, Father was undergoing a major depression and there were some psychotic features involved in that, which caused real concerns for Dr. Bromberg.

{¶ 25} On the CAPI, Father had a lie score of 14, which is about the highest possible level for a lie score, as well as a faking good response distortion index. Again, this meant Father was significantly underreporting his psychological behavior and was minimizing. Even so, Father's score was 229, which was high, with characteristics similar to known, active child abusers.

{¶ 26} Again, these issues could cause problems with Father's parenting, and Father told Dr. Bromberg that he was not sure he could parent a child because of his seizure disorder and occasional inability to control his behavior. Dr. Bromberg also recommended that Father receive DBT training, have his medication monitored, have individual counseling, and undergo training for anger management, life skills, and parental skills.

{¶ 27} Finally, Dr. Bromberg concluded that the children would be at risk if placed in their parents' care. He also stated that the parents were not ready to take on parenting on an independent basis. Both parents had experienced horrendous childhoods; their situations were chronic and would require years of work.

{¶ 28} Allene Anderson indicated that MCCS had referred Mother and Father to her agency for parenting education. When she first met with Mother and Father in September 2015, she had concerns because she recommended things and they did not follow through. From the beginning, she tasked them with finding appropriate housing and income, and they did not do those things. Mother completed parenting classes and did well with attendance, but was never able to start classes on nutrition and budgeting. Anderson kept a slot open for Mother, but Mother was sick and had a lot of health issues that prevented her from attending.

{¶ 29} Father also had health issues but his attendance was pretty good. After the parenting classes, Anderson was still concerned about Mother's and Father's ability to parent the children, as they would need adult supervision with them constantly to make sure they were caring for the children appropriately.

{¶ 30} Maggie Lupton, the visitation assessor, described her observation of

Mother, Father, and M.K. over six visits in the visitation center. Mother was present for four visits, M.K. was there for three visits, and Father was there on two occasions. Based on her observations (which included seeing M.K. hit one child, seeing inappropriate discipline, and seeing the children's safety in question when, for example, they were allowed to stand on couches and a parent would walk away after being told not to do so), Lupton concluded that all three individuals lacked understanding of age-appropriate developmental milestones, child safety, and age-appropriate expectations. When Lupton observed Mother and Father, she was not aware they had already completed parenting classes. She was concerned that these issues persisted after the classes. Lupton did indicate that Mother obviously loved the children and wanted to parent them.

{¶ 31} Cheryl Larcom was the initial MCCS caseworker from January 2015 through the end of July 2015. Her testimony was consistent with the items mentioned in the initial dependency complaint. Larcom referred the parents for parenting/psychological assessments and Promoting First Relationships (parenting classes). Mother was also referred to the Artemis Domestic Violence Center (due to the domestic violence). Mother completed a parenting/psychological assessment, but Father did not. Mother maintained appointments with her counselor, but there was no improvement in Mother's mental health. Mother complained about health issues and gave Larcom letters from her doctor and her father, who both stated that Mother could not live independently. Mother maintained she could not live alone and needed to continue to live with M.K.

{¶ 32} Mother completed parenting classes and went to Artemis. However, when Larcom left in July 2015, concerns still existed regarding Mother's mental health and ability to care for the children. Housing also continued to be a concern.

**{¶ 33}** Larcom first met with Father when he was released from jail in March 2015. However, his participation was sporadic, and another domestic violence incident occurred in May 2015. This time, when Father was released from jail, he went to Gateway Shelter. Larcom did not make a housing referral at that time because Father was working with Gateway for Men; she also did not make referrals for counseling because Father was already linked to Access Behavioral Health.

**{¶ 34}** The foster mother, C.K., testified that both children had been in her care since their release from the hospital in February 2015. Both children were diagnosed with RSV, a pulmonary disease, in mid-March 2015. R.P. was hospitalized for nine days, and E.P. was hospitalized for almost two months and was very sick. The children currently were doing well, but E.P. was typically admitted to the hospital once a month for extra oxygen or because he had developed another virus. E.P. had two or three appointments a week for physical, occupational, and speech therapy, and was on oxygen at night. R.P. had at least one appointment a week, and there were other special appointments for both children with the pulmonologist. In addition, E.P. had recently been diagnosed with chronic lung disease. C.K. stated that she and her husband were very bonded with the twins, loved them, and were willing to adopt them if the agency received permanent custody.

**{¶ 35}** Mary Locke was the ongoing caseworker assigned to the case, and had been involved since July 2015. Locke recounted the history of the case after she took over. She also discussed case plan objectives and the parents' progress with the plan. Father had maintained his income, as he was on SSI. He had also complied with probation requirements and had obtained a parenting/psychological assessment.

However, he had not followed through with Dr. Bromberg's recommendations, including obtaining additional anger management treatment. Father did not complete his parenting class objective; while he had competed two parenting classes, he could not demonstrate needed skills. His housing objective was also incomplete, because he was living in a homeless shelter at the time of the hearing. Finally, Father had not completed a substance abuse assessment.

{¶ 36} Mother had completed her parenting/psychological assessment, but had not followed through with Dr. Bromberg's recommendations, despite referrals. Mother was referred for dialectic behavioral therapy in August 2015 and was reminded every month about the referral. However, Mother had excuses why she was not going. Mother finally appeared for an intake interview in March 2016, but then cancelled or was a no-show for two appointments. In June 2016, Mother finally met with a screener for the DBT program, who concluded that Mother did not have the commitment needed to undergo the therapy; additionally, there was an issue concerning whether Mother's cognitive issues would prevent her from comprehending the program.

{¶ 37} Mother was already receiving psychological services from Access, but she had only gone four times in 2016, and had missed and cancelled many appointments in 2015. Mother, therefore, had not completed her mental health objective.

{¶ 38} As to the parenting objective, Mother had taken two parenting classes, but had not been able to demonstrate learned skills. Mother did visit the children regularly and was prepared for visits. However, there were safety issues during visits and issues due to Mother's unrealistic parenting expectations. Both parents also had to be monitored during visitation. Finally, Mother had missed more than 40% of the children's

doctors' appointments; Father had missed 85% of the appointments.

{¶ 39} Mother failed to complete the income objective.   While Mother claimed that a hearing on her SSI application had been scheduled, she never provided verification of income.   Mother also failed to complete life skills training.   MCCS made a referral for development of life skills, per Dr. Bromberg's recommendation, but Mother kept cancelling appointments and was terminated from the program.

{¶ 40} Finally, concerning housing, no progress had been made since January 2015.   During most of the case, Mother lived with M.K. and D.B. (and Father, intermittently) in the small two-bedroom house that Mother knew was unsuitable for the children.   Mother was adamant, however, that she wanted to live with M.K., and all four adults wanted to live together.   No change in housing occurred until August 2016, when Mother was kicked out of the house.   M.K. left the house a few weeks later, and at the time of the hearing, both Mother and M.K. lived in a homeless shelter.   Mother had a housing manager at that point, but the manager had no timeline as to when Mother would be able to obtain housing.   Mother, therefore, did not complete her housing objective.

{¶ 41} Locke also testified about the children's medical issues, including their premature birth, respiratory issues, developmental delays, and E.P.'s need for hospitalization.   Locke also described the children's relationship with the foster family, which was very positive.   The foster home was a foster-to-adopt placement.   According to Locke, reunification with Mother and Father was not possible because MCCS had offered the parents many services and they had not been able to demonstrate what they needed to do for their children, who had special needs.   Father had seizures and even said that he did not think he could parent until he got his health under control.   Both

parents had significant mental issues, and Mother, particularly, had not followed through with appointments. Locke stated that permanent custody was in the children's best interests because the children needed a permanent home, and MCCS did not believe the issues with the parents could be corrected. Moreover, MCCS had investigated possible relatives of the parents, as well as non-relatives for placement, but did not find anyone willing or able to care for the children.

{¶ 42} As was noted, Mother and Father did not present testimony or any other evidence. At the conclusion of the hearing, the GAL stated that she had worked with the parents, foster parents, and agency since 2015, and she again recommended that the agency be given permanent custody.

{¶ 43} On October 16, 2016, the magistrate issued a decision concluding that permanent custody of the children should be awarded to MCCS. Mother filed objections to the magistrate's decision; Father did not file objections. After the transcript was filed, Mother filed supplemental objections on April 7, 2017. Subsequently, on September 15, 2017, the trial court filed a decision overruling Mother's objections.

{¶ 44} The trial court concluded that MCCS made reasonable efforts to eliminate the continued removal of the children from the family and to make it possible for the children to safely return home. Additionally, the court concluded that the children had been in MCCS's custody for more than twelve months and that it was in the children's best interest to grant permanent custody to MCCS. The court further held that a second extension of custody was not in the children's best interests because Mother and Father had not made significant progress and it was not reasonable to believe the children would be reunited with either parent during a second extension period.

{¶ 45} Mother timely appealed from the judgment of the trial court.   Father did not appeal.

II.   Did Clear and Convincing Evidence Support a Grant of Permanent Custody?

{¶ 46} Mother's First Assignment of Error states that:

The Trial Court Erred in Finding that Clear and Convincing Evidence Supported Permanent Custody.

{¶ 47} Under this assignment of error, Mother contends that MCCS was not entitled to permanent custody because the factors in R.C. 2151.414(D) weigh in favor of the biological parents.

{¶ 48} Parents have essential and basic rights to conceive and raise children, but these fundamental rights are not absolute.   (Citations omitted.)   *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 39; *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11.   In particular, "the government has broad authority to intervene to protect children from abuse and neglect." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28.

{¶ 49} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing R.C. 2151.414(E).   (Other citation omitted.)   The Supreme Court of Ohio defines "clear and convincing evidence" as " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the

facts sought to be established.' " *In re K.H.* at ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶ 50}** Decisions on terminating parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. We review the court's judgment on this matter for abuse of discretion. *See In re C.F.* at ¶ 48 (applying an abuse-of-discretion standard to the trial court's findings under R.C. 2151.414).

**{¶ 51}** As relevant here, R.C. 2151.414(B)(1) states that:

Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

* * *

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the

earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

**{¶ 52}** In this case, there is no dispute that E.P. and R.P. had been in the temporary custody of MCCS for twelve or more months of a consecutive twenty-two month period, and that MCCS only needed to establish that an award of permanent custody to the agency was in the best interests of these children. *See, e.g.*, *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21; *In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 20. (Citation omitted.)

**{¶ 53}** Concerning a child's best interests, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15. "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. To evaluate the court's decision, we will

consider these statutory factors.

### A. Interaction and Interrelationship of Children with Parents and Foster Parents

**{¶ 54}** The trial court discussed the interaction of the children with their parents and foster parents and concluded that this factor weighed against granting custody of the children to MCCS. The court noted testimony that the biological parents loved and wanted to care for their children, the strong bond between the children and the foster parents, and the lack of a significant bond between the children and the parents. We may not have made the same finding after viewing the evidence in its entirety, but we do defer to the trial court's decision. There is no dispute that the biological parents love their children.

### B. The Wishes of the Children

**{¶ 55}** The trial noted that no testimony had been presented at the hearing about the children's wishes. As a result, the court found that this factor did not weigh either for or against granting permanent custody to MCCS. We agree with the trial court. The children were only about a year and a half old at the time of the hearing and would not have been able to express their wishes.

### C. Custodial History

**{¶ 56}** The trial court concluded that the custodial history factor weighed in favor of granting custody to MCCS. In this regard, the court commented that the children had been in foster care with the same family since they were released from the hospital after

birth. The children had done very well there, and while delayed, were reaching developmental milestones and their medical and special needs were being met. Again, we agree with the trial court, as this finding is amply supported in the record by competent, credible evidence.

### D. The Need for Legally Secure Placement

{¶ 57} Concerning this factor, the trial court concluded that considering the length of time the children had been removed from the home, they desperately needed a "legally secure, permanent placement." J.C. Case No. 2015–783, Doc. # 5, p. 11. The court stressed the parents' failure to complete their case plan, their failure to meet the children's needs as noted by the GAL, the significant mental health issues of both parents, and MCCS's belief that the parents' issues could not be corrected. The record contains an abundance of competent and credible evidence to support these conclusions. The findings of Dr. Bromberg are particularly significant and troubling, and the evidence clearly indicates there is no reasonable possibility that Mother and Father would be able to provide a legally safe and secure environment for the children.

### E. Whether any Factors in R.C. 2151.414(E)(7) to (11) Apply

{¶ 58} In its discussion, the trial court considered R.C. 2151.414(E)(1), (2), (4) and (14).[3] In view of the history of the case and the testimony at the custody hearing, we find

---

[3] Technically, R.C. 2151.414(E)(1), (2), (4)and (14) were not required under this analysis, but the court discussed them, and we will, too. None of the factors in R.C. 2151.414(7)-(11) were present. However, R.C. 2151.414(D)(1) does not limit the factors that can be considered, and the trial court did not err in discussing R.C. 2151.414(E)(1), (2), (4), and (14).

no abuse of discretion in the trial court's findings on these factors.

{¶ 59} R.C. 2151.414(E)(1) pertains to whether "the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." After considering the parents' use of rehabilitative and other social services, the court noted that the parents failed to complete their case plan objectives. Again, we agree. MCCS offered many services to parents, and they failed to remedy the conditions that caused the children's removal.

{¶ 60} R.C. 2151.414(E)(2) relates to "Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the [custody] hearing * * *." The trial court went into considerable detail regarding this factor, focusing on Dr. Bromberg's testimony about both parents' psychological difficulties, their scores on the child abuse potential inventory, the chronic nature of these problems, and the fact that the parents failed to comply with recommendations and mental health treatment. Further, the court noted both parents' physical problems, including seizures and the fact that mother had presented proof that she could not live independently. The court, therefore, concluded that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. Again, there is ample credible evidence in the record to support the court's conclusions.

{¶ 61} R.C. 2151.414(E)(4) pertains to whether a "parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an

adequate permanent home for the child * * *." The trial court found that this factor applied due to the parents' failure to address their case plan objectives. The court also highlighted the parents' unwillingness to provide an adequate permanent home for their children. Again, we agree. Throughout the case, Mother and Father made no attempt to find housing other than the place that they knew was completely unsuitable. Their only change from that housing was to leave for jail (Father) or for homeless shelters (both parents).

{¶ 62} Finally, the trial court discussed R.C. 2151.414(E)(14), which concerns whether a "parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect." In this regard, the court focused on various concerns that existed in addition to the parents' mental health and physical disabilities. These concerns included the following items: Mother's inability to begin classes in nutrition and budgeting; both parents' inability to parent; both parents' lack of understanding of age-appropriate developmental milestones; both parents' problems in communicating with the children; safety issues; and Mother's insistence that she had to live with M.K., coupled with the fact that M.K.'s boyfriend, D.B., refused to participate in substance abuse services. In light of the testimony and case history outlined above, the trial court's conclusion about the applicability of R.C. 2151.414(E)(14) is well-supported by the competent, credible evidence in the record.

{¶ 63} As a final matter, Mother argues that the trial court should have allowed a second extension of temporary custody so that she could complete case plan services. We disagree. Given the lack of progress throughout the history of the case, there is no

indication that a second extension of temporary custody would have had any effect.

**{¶ 64}** Based on the preceding discussion, we conclude that the juvenile court properly weighed the pertinent factors in R.C. 2151.414(D) and (E), and in doing so, did not abuse its discretion in finding that granting permanent custody to MCCS was in the children's best interest.   Accordingly, Mother's First Assignment of Error is overruled.

### III.   Did the Court Err in Finding that MCCS Made Reasonable Efforts?

**{¶ 65}** Mother's Second Assignment of Error states that:

The Trial Court Erred in Granting Permanent Custody Because Children Services Failed to Make Reasonable Efforts to Eliminate the Continued Removal of the Child from the Child's Home or to Make It Possible for the Child to Return Home Safely.

**{¶ 66}** Under this assignment of error, Mother contends that MCCS failed to make reasonable efforts to make it possible for the children to remain in the home or to return home.   Mother relies on these allegations: (1) MCCS failed to make reasonable efforts concerning the parents' housing because it did not make housing referrals; (2) MCCS failed to make any referral to Mother to assist her in obtaining verifiable income; (3) MCCS failed to make reasonable efforts to assist Father with Dr. Bromberg's recommendations.

**{¶ 67}** " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' "   *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.,* 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30.   " 'Reasonable efforts' does not mean all available efforts.

Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." (Citation omitted.) *In re K.M.*, 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23. *Accord In re C.O.*, 2d Dist. Montgomery No. 26610, 2015-Ohio-4290, ¶ 43; *In re N.M.*, 2d Dist. Montgomery Nos. 26693, 26719, 2016-Ohio-318, ¶ 53.

{¶ 68} We have described "reasonable efforts" as " 'a good faith effort which is "an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage." The issue is not whether [the Agency] could have done more, but whether it did enough to satisfy the "reasonableness" standard under the statute.' " *In re S.F.*, 2d Dist. Montgomery No. 25318, 2013-Ohio-508, ¶ 21, quoting *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096, ¶ 13; *In Re: A.F.*, 2d Dist. Montgomery No. 27611, 27625, 2018-Ohio-310, ¶ 65.

{¶ 69} After reviewing the record, we agree with the trial court that MCCS made reasonable efforts to eliminate the continued removal of E.P. and R.P. from the parents' home and to make it possible for the children to safely return home. As was noted, from the beginning of the case, Mother insisted that she wanted to live with M.K., D.B., and Father. Early in the case, Mother told MCCS that the landlord was finding a larger place, but that never materialized, despite the fact that Mother continued to make this representation. Around January 2016, Mother and Father said they were going to get their own place, and the MCCS caseworker gave them a list of subsidized housing available through DMHA, as well as privately-owned subsidized housing. Unfortunately, obtaining housing from DMHA was a problem because of Father's criminal record. However, the MCCS caseworker urged Father to continue to apply because he was more

likely to obtain housing when more time had passed since his conviction. The caseworker also tried to discuss case-managed housing with Mother, but Mother was adamant that she had to live with M.K., and rejected this possibility. It is hard to see what more MCCS could have done in light of the parties' insistence on remaining in housing that they knew was inappropriate.

{¶ 70} Concerning income, Mother told MCCS that she had applied for SSI. At one point, Mother said she had been rejected and had appealed. In September 2016, the GAL's report noted Mother's statement that she had been approved for SSI and would be receiving payment very soon. The GAL also commented that Mother had been saying the same thing for a substantial period of time. Mother never provided verification of any of these facts. If Mother had evidence of income, she should have provided it to MCCS.

{¶ 71} Finally, concerning Father's parenting/psychological assessment, there was a delay at the beginning of the case because Father was in and out of jail. MCCS also could not do a parenting assessment because Father had not participated in training to administer E.P.'s oxygen. Notably, the oxygen company went to the parents' house in May 2015 to train the parents. Father was present and chose not to do the training, which caused a delay.

{¶ 72} Subsequently, Father expressed an interest, and as soon as he did, the MCCS caseworker (Locke) helped Father get the oxygen training scheduled. This occurred in October 2015, and once that was scheduled, Locke made a referral for Father's parenting/psychological assessment. Father was then scheduled to have the assessment completed in February 2016, but E.P. was hospitalized at that time. Dr.

Bromberg wanted to do the assessment with both children present, and MCCS was finally able to get Father and the children into Dr. Bromberg's office in April 2016. MCCS did not get Dr. Bromberg's report until July 2016, which was after the motion for permanent custody had been filed. Nonetheless, MCCS was not responsible for the delay; Father was responsible.

{¶ 73} In any event, after MCCS got the report, Locke made referrals to Father to complete Dr. Bromberg's recommendations. Locke recommended that Father go back to Access for the additional anger management counseling Dr. Bromberg had recommended. However, Father said he was not interested because he had already completed a "Stop the Violence" program as part of his probation requirements. When Locke explained that the doctor's recommendation for additional training was made after Father had completed the Stop the Violence program, Father still was not interested and did not complete additional training.

{¶ 74} Notably, a substance abuse assessment was added to Father's case plan in May 2016 after Father had been arrested for public intoxication. Locke gave Father a list of area providers, but after telling Locke that he had made an appointment with a provider, Father did not follow through.

{¶ 75} In view of the preceding discussion, we agree with the trial court that MCCS made reasonable efforts to reunify the family and prevent the continued removal of the children. Accordingly, the Second Assignment of Error is overruled.

## IV. Conclusion

{¶ 76} All of Mother's assignments of error having been overruled, the judgment of

the trial court is affirmed.


. . . . . . . . . . . . .


DONOVAN, J. and TUCKER, J., concur.


Copies mailed to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Sean Brinkman
April Moore-GAL
Derrick Strahorn
Hon. Anthony Capizzi