[Cite as *In re A.J.R.*, 2020-Ohio-4490.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| IN RE: A.J.R. & A.J.S. | : | Appellate Case No. 28706 |
|  | : | Trial Court Case Nos. 2015-7099 |
|  | : | 2015-7101 |
|  | : | (Appeal from Common Pleas |
|  | : | Court – Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of September, 2020.

. . . . . . . . . . .

SARA M. BARRY, Atty. Reg. No. 0090909, 111 West First Street, Suite 1150, Dayton, Ohio 45402
      Attorney for Appellant, Mother

MATHIAS H. HECK, JR. by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Appellee, MCCS

MICHELLE M. MACIOROWSKI, Atty. Reg. No. 0067692, 7333 Paragon Road, Suite 170, Dayton, Ohio 45459
      Attorney for Minor Children

. . . . . . . . . . . . .

HALL, J.

**{¶ 1}** Mother appeals from a judgment granting permanent custody of her minor children, A.J.R. and A.J.S., to Montgomery County Children Services (MCCS). Mother contends that the trial court erred by granting permanent custody to MCCS rather than to one of two willing alternative placements.

**{¶ 2}** We conclude that the trial court did not abuse its discretion by granting MCCS permanent custody. The court's determination that granting custody to MCCS rather than to one of the alternative placements was in the children's best interest was supported by competent, credible evidence. We affirm.

## I. Factual and Procedural Background

**{¶ 3}** On November 18, 2015, MCCS filed its third complaint of neglect and dependency in the Montgomery County Juvenile Court as to Mother's minor son, A.J.R. (born in November 2009), and minor daughter, A.J.S. (born in April 2014), after Mother left the children with someone and failed to pick them up within a reasonable period of time. The complaint alleged that Mother had cognitive delays, possible severe mental-health issues, and admitted substance-abuse problems, rendering her unable to care for the children. MCCS also filed a motion for ex parte temporary interim custody of the children. The trial court granted MCCS temporary interim custody immediately and again after a hearing. The court adjudicated the children neglected and dependent in January 2016 and granted MCCS temporary custody. When MCCS received custody, it placed the children in a foster home, where they have remained.

**{¶ 4}** In September 2017, MCCS filed a motion for permanent custody. Mother also filed a motion for custody, asking that legal custody be granted to her or, alternatively, to

her friend Lashawna Kay. Mother later amended the motion to add Z.S., her sister, as another potential placement.

A. *The June 2018 dispositional hearing*

{¶ 5} In June 2018, a magistrate held a dispositional hearing on the pending motions. The family's caseworker, the children's guardian ad litem (GAL), the children's foster mother, and the two people suggested by Mother as potential placements testified at the hearing. Their testimony established the following facts.

{¶ 6} According to the family's caseworker this was not the first time that Mother had left the children with another person for an extended period of time. MCCS believed that Mother did not have independent housing or income to provide for the basic needs of the children. It was also concerned about Mother's alcohol and drug use, as well as her mental health. A case plan was created for the family to address the concerns that led to the children's removal. The plan's original goal was reunification. The case plan included objectives for Mother and the two potential placements, Lashawna Kay and a maternal aunt, Z.S. Mother signed the case plan in 2015 and, while the caseworker had been able to discuss the objectives with Mother via Facebook messenger, the caseworker had not been able to have an actual visit with Mother in over a year. Since the case was opened, Mother had not maintained regular contact with MCCS.

*Mother's failure to meet her case-plan objectives*

{¶ 7} Mother had several objectives. One objective was to obtain and maintain income. The last verified income she had was in 2016. The caseworker had talked with Mother about applying for Social Security, and Mother had a Social Security appointment scheduled in April 2018. But at the time of the hearing, the caseworker did not know if

Mother was receiving Social Security or had any other income. A second objective was to obtain and maintain housing. Mother had reported to the caseworker that since March 2018, she had been living with her godfather. But she failed to provide the caseworker with a full address, so the caseworker was unable to visit the residence to see whether it was safe and appropriate for the children. A third objective was for Mother to complete assessments of her mental health and of her alcohol and drug use and to follow all recommendations. MCCS had concerns about Mother's mental health, and Mother had reported regularly drinking heavily and smoking marijuana. MCCS referred her to various assistance programs, but Mother failed to engage in any treatment or follow any recommendations. A fourth objective was to visit with the children regularly. Mother's last visit with the children had been in April 2017. Before that, her visits were inconsistent, as months would pass without a visit. A final objective in Mother's case plan was to attend educational and medical appointments for the children; despite being told about meetings, she failed to attend all but one school meeting.

*Lashawna Kay as a potential placement*

{¶ 8} Mother identified her friend Lashawna Kay as a potential placement for the children. While Kay did not sign the case plan, she agreed to work on objectives that MCCS identified for her.

{¶ 9} One objective was to visit with the children regularly. During the six or seven months before the June 2018 hearing, Kay usually had the children over to her house two days a week and kept them overnight on the weekends. But while the children were there, Kay interacted with them very little. The caseworker observed three of these visits and noted that Kay did not interact much with the children. The children reported to the

caseworker that, during their visits, Kay would be in her bedroom or just sitting on the couch. A.J.R. told the caseworker that he usually played video games with Kay's boyfriend, Nick. Indeed, Nick was the one who would interact with the children the most, pick them up from visits, cook for them, and play with them, which led the caseworker to believe that the children were more bonded to Nick than to Kay. The caseworker also witnessed A.J.R. have behavioral problems that Kay was unable to handle. The guardian ad litem (GAL) observed about six visits in Kay's home, and she agreed that Nick was the primary caregiver. The GAL too noted that Kay would not really interact with the children—"there's just no interaction with the children whatsoever." (Vol. I Tr. 118).

{¶ 10} The children's foster mother did not believe that Kay and the children were bonded, based on her observations. She too believed that they are more bonded with Nick. The foster mother said that she had to help A.J.R. with his schoolwork every day and that it was not always completed when he was with Kay. The foster mother also said that Kay had called her multiple times when A.J.R. acted up and Kay did not know what to do with him. According to the foster mother, sometimes Kay could control him and other times she could not.

{¶ 11} For her part, Kay believed that she and the children had a bond. She said that she and A.J.S. get their nails done, watch cartoons together, and play board games and that she and A.J.R. play video games together and paint. Kay believed that she could control A.J.R.'s misbehavior and that completing his schoolwork was not a problem.

{¶ 12} Another of Kay's objectives was to maintain housing. Kay lived in a two-bedroom apartment with her boyfriend, Nick. A.J.R. had one room, A.J.S. slept on an air mattress in a bedroom with Kay, and Nick slept on the couch. While MCCS deemed it

appropriate right now, the agency did suggest to Kay that she get a larger apartment in the event that she received custody of the children. According to the caseworker, long term, the living arrangements in Kay's apartment would not be appropriate under MCCS standards. Kay said that she planned to move into a bigger apartment if she were granted custody of the children.

{¶ 13} A third objective for Kay was to maintain income to meet the basic needs of the children. Kay was not employed but received Social Security. Nick, her boyfriend, worked at Walmart, and Kay said that Nick was willing to help support the children. Kay did not have a driver's license or a car and used the Uber car service. Nick also did not drive.

{¶ 14} A fourth objective was to complete a parenting class. MCCS had concerns about Kay's ability to discipline the children, establish structure for them, and interact with them. Kay said that she did not feel that she needed parenting classes but said that she was willing to do one. She was referred to a parenting class in February 2018, and the caseworker took her to the first session. But Kay did not attend any further sessions and was terminated from the class. Kay said that she missed the second session because she was visiting her sister in the hospital and because she did not know that the class had more than one session that she needed to attend. About two weeks before the June 2018 hearing, MCCS referred Kay to another parenting class, but she had not yet heard from the class.

*Z.S. as a potential placement*

{¶ 15} Mother also identified Z.S., her sister, as a placement for the children. The trial court noted that Mother identified Z.S. only after Mother had an altercation with Kay.

{¶ 16} The children know Z.S. because they and Mother lived with her for a period of time. Z.S. visited the children while they were in foster care, and the caseworker believed that the children had a bond with her and with Z.S.'s own three children. But in September 2017, Z.S. moved to California. Since then, she had not seen the children, but she typically spoke to them on the telephone several times a month. MCCS tried to initiate a placement with her in January 2018 under the Interstate Compact for the Placement of Children (ICPC) but was unable to do so because Z.S. had given MCCS an incorrect telephone number. So the ICPC process was not initiated until April 2018, when MCCS obtained Z.S.'s correct telephone number from Mother's attorney. Under the ICPC, before a placement is approved, a home study must be conducted by the state agency. Z.S.'s home study was delayed because she had given the California agency an incorrect phone number too. By the June 2018 hearing, the home study was still not done. The caseworker questioned the adequacy of Z.S.'s home, a three-bedroom apartment, as she had three of her own children living with her.

{¶ 17} Z.S. said that it was her understanding that she could have up to eight people in a three-bedroom apartment. She explained that she would have the two boys sharing one bedroom and the three girls sharing the other bedroom. Z.S. said that she earned about $2,200 to $2,300 per month.

B. *The GAL's June 2018 report and recommendation*

{¶ 18} In her June 2018 report and recommendation, the GAL stated her belief that it was in the children's best interest for MCCS to be granted permanent custody. The GAL had not seen a bond between the children and Kay and believed that Kay had not made an effort to become bonded. Alternatively, the GAL believed that the children should be

placed with Z.S., because they were bonded with her and with their cousins, though she had not observed any visits. The GAL believed that the children would be safe with Kay and Nick, though she did not believe that they would progress. But the GAL noted that "Caseworker has concern that if the Children are placed with Proposed Custodian and her Boyfriend leaves the home, the Children will not be properly cared for because the Proposed Custodian's Boyfriend is who regularly and consistently interacts with the Children during visits."

### C. *The December 2018 status-review hearing*

{¶ 19} After the June hearing, the matter was set for a status-review hearing to allow more time for Z.S.'s California home study to be completed. The review hearing was held in December 2018, and only the caseworker and Mother testified.

{¶ 20} According to the caseworker, California was going to deny the ICPC request that the children be placed with Z.S., because Ohio was unable to provide funding for care. Since the June hearing, neither MCCS nor the children had had contact with Z.S. The phone number that she had provided no longer worked. As for Kay, the caseworker said that she had started a parenting class in October 2018 and had two sessions left. But MCCS still had concerns about Kay's ability to handle A.J.R.'s behavioral problems, as Kay continued to contact the foster mother when A.J.R. had problems during visits. The caseworker said that A.J.R.'s school counselor and teacher reported that they had noticed a pattern of acting out the day before or after his visits with Kay. There also remained concerns that homework assignments that Kay worked on with A.J.R. were not being completed or not being completed correctly. The caseworker reported that A.J.R. was comfortable in Kay's home and liked going there, though mostly because he got to

play video games. Kay was given the opportunity to attend A.J.R.'s basketball practices and games, but she did not attend any.

{¶ 21} Mother said that if the children were not returned to her, she would like them to live with Z.S., and if not with Z.S., then with Kay. Mother admitted that she had not visited with the children since April 2017.

D. *The GAL's December 2018 report and recommendation*

{¶ 22} Just before the December hearing, the GAL submitted another report and recommendation to the trial court. In this report, the GAL offered a different custody recommendation. She recommended that the court grant legal custody to Kay with protective supervision by MCCS for one year.

E. *The custody decision*

{¶ 23} In January 2019, the magistrate granted MCCS's motion for permanent custody and denied Mother's motion for custody. The magistrate determined that a grant of permanent custody to MCCS was in the best interest of the children. Mother filed objections to the magistrate's decision, arguing that granting custody to MCCS was not in the children's best interest when Z.S. and Kay were willing to take custody. Mother contended that it was in the children's best interest to be placed with Kay. Counsel for A.J.R. filed objections on the child's behalf also contending that granting MCCS permanent custody was not in the child's best interest.

{¶ 24} While the trial court was considering the objections, the GAL submitted her May 2019 report and recommendation. The GAL reported that "Kay stopped accepting calls from the children shortly after PC [permanent custody] was granted to MCCS. Z.S. stopped communicating with the children shortly before PC was granted to MCCS. When

asked, Z.S. reported she was having issues with her phone. She indicated that she would keep in touch with the children using her mother's phone but failed to do so." The GAL returned to her June 2018 recommendation and recommended that the court grant permanent custody to MCCS.

{¶ 25} On January 7, 2020, the trial court overruled all the objections to the magistrate's custody decision. The court terminated Mother's legal custody of the children and, rejecting the proposed alternative placements, granted permanent custody to MCCS.

{¶ 26} Mother appeals.

## II. Analysis

{¶ 27} Mother's sole assignment of error alleges:

THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THERE WERE TWO POSSIBLE LEGAL CUSTODY ALTERNATIVES.

{¶ 28} Mother does not really dispute that she should not be the caretaker of her children. Rather, her argument is that the weight of the evidence favored permanent custody either to Kay or Z.S. We note that counsel for the children filed a notice of intent not to file a brief, indicating that the children's position is that the trial court's decision was correct and that granting permanent custody to MCCS was in their best interest.

{¶ 29} A decision terminating parental rights "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established."

(Citations omitted.) *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "We review the court's judgment on this matter for abuse of discretion." *In re R.P.*, 2018-Ohio-517, 105 N.E.3d 737, ¶ 50 (2d Dist.), citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying an abuse-of-discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 30} R.C. 2151.414(B)(1) pertinently states:

Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

* * *

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶ 31} "R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." *In re*

*C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 9. In addition to requiring a hearing, "R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency." (Citation omitted.) *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14. "The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." (Citation omitted.) *Id.,* citing R.C. 2151.414(B)(1).

{¶ 32} Here, Mother concedes that the children had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period. She challenges only the trial court's determination that granting permanent custody to MCCS was in the best interest of the children. Consequently we consider only the first prong of the two-part test, that is, the trial court's best-interest determination and findings. *See In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 20.

{¶ 33} When determining a child's best interest, R.C. 2151.414(D) directs a trial court to consider all relevant factors, including, "(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public

children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15. "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 34} The trial court here considered each of these factors. We review the trial court's findings.

 (1) *Interaction and interrelationship of children with parents, foster parents and others*

{¶ 35} The trial court examined Mother's, Z.S.'s, and Kay's relationships with the children and concluded that this factor weighed in favor of granting MCCS custody. The children were removed from Mother's care in November 2015, but it appeared that, since the spring of that year, the children had already been living outside Mother's home. The court found that Mother appeared to have little relationship with the children, as she had not visited with them since April 2017.

{¶ 36} Mother and the children previously lived with Z.S. for several years when they were younger. Z.S. moved to California in September 2017 and had not seen the children since. While Z.S. had telephone contact with the children, this contact had been inconsistent, and there were multiple periods throughout 2018 when she did not contact the children for several months. The court also found that Z.S.'s home study in California was not going to be approved.

{¶ 37} Kay has consistently visited with the children and had overnight visits with the children in her home. Kay believed a bond exists between her and the children, but concerns were raised about Kay's lack of interaction and bonding with them, based on the observations of the caseworker and the GAL. Each testified that the children appeared more bonded to Kay's boyfriend than to her, and each testified that, during observed visits, they often had to prompt Kay to interact with the children.

(2) *The wishes of the children*

{¶ 38} The GAL testified that A.J.S., due to her age, was unable to articulate her feelings about her placement, other than noting that her stomach hurt when she visited Kay. A.J.R.'s wishes appeared to have changed over time. He said that he liked Kay and Nick, her boyfriend. A.J.R. also said at one point that he wished to live with Z.S. The GAL said that A.J.R. told her that if he were to live with Kay, it would be only because she has video games. When asked by the GAL if he would still want to live with Kay without the video games, he said that he would not, "because [Kay] smokes." (Vol. I Tr. 124).

(3) *Custodial history*

{¶ 39} The trial court found that the children were placed in MCCS's temporary custody in November 2015 and had remained in the agency's custody ever since. The children had been living in the same foster home the entire time. At the time that MCCS filed its motion for permanent custody in September 2017, the children had been in the agency's custody for around twenty-two consecutive months.

(4) *The need for legally secure placement*

{¶ 40} The trial court found that Mother had failed to complete her case-plan objectives and that numerous concerns existed about her substance abuse, mental

health, and ability to provide for the children's basic needs. Mother had not engaged in any referred services to address those concerns, and Mother had not visited with the children since April 2017.

{¶ 41} As for Z.S., she moved to California in September 2017 and had not seen the children since, maintaining only sporadic phone contact with them. At the time of the December 2018 hearing, the California home study required to place the children with her was still not complete, but the California agency indicated that it would likely not approve the placement. Z.S. did not have any contact with the children or MCCS for multiple months leading up to the December 2018 hearing.

{¶ 42} With respect to Kay, both the GAL and the caseworker testified, based on multiple observed visits, that they did not believe a bond existed between Kay and the children. During the visits they observed, they said that there was little interaction between Kay and the children. A.J.R. reported to the GAL that he mostly just played video games while at Kay's house. Concerns were also raised about A.J.R.'s not completing homework while with Kay or having his homework done incorrectly. It was also noted that there were multiple occasions in which Kay had to rely on the foster mother in dealing with A.J.R.'s behavioral problems, and it appeared that he had more behavioral problems around the time that he visited her. The trial court found that no significant bond existed between Kay and the children and that she had not displayed an ability to care for the children as a full-time legal custodian.

(5) *Whether any factors in R.C. 2151.414(E)(7) to (11) apply*

{¶ 43} The trial court found that none of the factors in R.C. 2151.414(E)(7) to (11) applied in this case. We see no problem with this finding.

*The alternative placements*

**{¶ 44}** The trial court acknowledged that two willing alternative placements existed but determined that neither placement was in the children's best interest. Z.S.'s home study was incomplete and it was unlikely that California would approve the placement. Moreover, her contact with the children had been limited since she moved to California in September 2017. Although Kay had visited with the children, numerous concerns still existed regarding the overall structure of her home stemming from the lack of bonding, the lack of interaction, and her apparent inability to handle A.J.R.'s behavioral problems and scholastic needs.

**{¶ 45}** The court acknowledged the GAL's December 2018 recommendation that Kay be granted permanent custody. But the court pointed out that the GAL's June 2018 recommendation was that MCCS be granted permanent custody, and the court could discern no reason for the change.

**{¶ 46}** We note that the GAL's most recent recommendation in her May 2019 report was that MCCS be granted permanent custody. The GAL neatly summed up in that report why granting permanent custody to MCCS, and not to Kay or Z.S., was in the children's best interest:

> [Mother] was given the opportunity to get housing and regular income and failed to do so. Lashawna Kay visited with the children regularly but there was concern that she was unfit to care for the children full time. She failed to interact with children during visits, leaving that responsibility to her paramour. She struggled with transportation thus missing visits with the children and not attending required parenting classes. When those

parenting classes were set up at her house, she was not completing the tasks that the instructor asked of her initially. She also did not show up to court hearings as expected.

[Z.S.] failed the ICPC due to lack of housing space and lack of income.

**{¶ 47}** We conclude that the trial court properly weighed the relevant factors in R.C. 2151.414(D) and that the trial court's findings were supported by competent, credible evidence.

### III. Conclusion

**{¶ 48}** There was competent, credible evidence from which the court could have determined that granting MCCS permanent custody was in the children's best interest. Given the facts and evidence, we cannot say that the trial court abused its discretion by granting MCCS permanent custody of the children. The sole assignment of error is overruled.

**{¶ 49}** The trial court's judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Sara M. Barry
Michelle M. Maciorowski
Ben M. Swift
Hon. Helen Wallace