[Cite as *In re J.R.*, 2018-Ohio-2556.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

IN THE MATTER OF:           :
                               :

                               :     Appellate Case No. 2017-CA-44

          J.R.                 :
                               :     Trial Court Case No. N46318

                               :
                               :     (Appeal from Common Pleas Court,
                               :     Juvenile Division)

                               :
                               :

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of June, 2018.

. . . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Greene County Prosecutor's Office, 55
Greene Street, 1st Floor, Xenia, Ohio 45385
      Attorney for Appellee - Greene County Children Services

CARL BRYAN, Atty. Reg. No. 0086838, 120 West Second Street, Suite 603, Dayton,
Ohio 45402
      Attorney for Appellant - Father

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Father appeals from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which granted permanent custody of his son, J.R., to Greene County Children Services (GCCS). For the following reasons, the judgment of the trial court will be affirmed.

{¶ 2} J.R., then age 12, was placed in the temporary custody of GCCS in March 2015, due to "the family's pattern of hazardous home conditions," which included cockroach and bed bug infestations, lack of running water, holes in the floor, carbon monoxide leaking from a water heater, and faulty wiring. J.R. had previously been living with his paternal grandparents at the grandparents' home. J.R. was placed in foster care, and a guardian ad litem was appointed. Case plans were developed for both parents.

{¶ 3} In September 2016, after two extensions of temporary custody, GCCS filed a motion for permanent custody of J.R. The motion asserted that Mother had abandoned J.R., that J.R. could not be placed with either parent within a reasonable time, that J.R. had been in GCCS's temporary custody for 12 or more months of a consecutive 22-month period, and that it was in J.R.'s best interest to grant permanent custody to GCCS. The trial court conducted a hearing on the motion and, on July 25, 2017, the court granted GCCS's motion for permanent custody of J.R.

{¶ 4} Father appeals from the trial court's judgment, raising three assignments of error.[1]

---

[1] Father was represented by counsel at trial. Mother was represented by counsel at trial, but she participated to a very limited extent, and she is not a party to this appeal.

### *Standard of Review*

{¶ 5} R.C. 2151.414(B) establishes a two-part test for courts to apply when determining a motion for permanent custody of a child to a public children services agency. In relevant part, the statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) is present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1); *In re N.C.*, 2d Dist. Montgomery No. 26611, 2015-Ohio-2969, ¶ 13.

{¶ 6} R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (a) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *See also In re N.C.* at ¶ 14.

R.C. 2151.414(E)(7) through (11) include whether the parent has been convicted of any of a number of listed offenses; whether the parent has repeatedly withheld medical treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two or more times or refused to participate in treatment; whether the parent has abandoned the child; and whether the parent has had parental rights previously terminated.

**{¶ 7}** All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. Clear and convincing evidence is "that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Citations omitted.) *In re R.P.*, 2d Dist. Montgomery No. 27746, 2018-Ohio-517, ¶ 49, citing *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, at ¶ 42. We review a trial court's determination that an award of permanent custody is supported by clear and convincing evidence under an abuse of discretion standard, which implies a decision that is unreasonable, arbitrary, or unconscionable. *In re: T.S.*, 2017-Ohio-482, 85 N.E.3d 225, ¶ 6 (2d Dist.), citing *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14.

**{¶ 8}** A trial court's decision on termination of parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have

been established." (Citations omitted.) *In re L.J.*, 2d Dist. Clark No. 2015-CA-85, 2016-Ohio-2658, ¶ 21, citing *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

**{¶ 9}** We must therefore consider both whether the trial court abused its discretion in finding that an award of permanent custody was supported by clear and convincing evidence and whether the trial court's judgment was against the manifest weight of the evidence. *See, e.g., In re: E.S.*, 4th Dist. Pickaway No. 17CA16, 2018-Ohio-1902, ¶ 23, citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 550 N.E.2d 178 (1990), syllabus and *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159 (1997).

### *Dependency and/or Neglect as Basis for Award of Permanent Custody*

**{¶ 10}** In his first assignment of error, Father contends that the trial court erred in concluding that J.R. could not or should not be placed with him within a reasonable period of time, pursuant to R.C. 2151.414(B)(1)(a). Citing R.C. 2151.414(E)(3), Father argues that the trial court was not permitted to base such a finding only on events that predated the filing of the original complaint alleging abuse or neglect.

**{¶ 11}** The trial court based its finding that J.R. could not be returned to his father within a reasonable period of time solely on the fact that, in 2015, when J.R. was removed from the grandparents' home and placed in the temporary custody of GCCS, he was found to be a neglected and dependent child "based upon the instability and general lack of adequate care from his parents resulting from their own faults or habits and the inhospitable nature of his grandparents' home," where J.R. and Father had then lived. Thus, Father correctly observes that the trial court based this conclusion on events that preceded the filing of the complaint for dependency and neglect and which formed the basis for J.R.'s 2015 removal from his home. R.C. 2151.414(E)(3) states that a finding

that a child cannot be returned to a parent's home within a reasonable period of time shall be based on "all relevant evidence," but that where such a finding is based on the parent's abuse of the child or having caused the child to be neglected, the finding must be based on events "between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody." Thus, the trial court appears to have improperly relied upon events predating the filing of the original complaint.

{¶ 12} However, the trial court also found that J.R. had been in the temporary custody of GCCS for 12 or more of the last 22 months, as was alternately asserted in the motion for permanent custody. Pursuant to R.C. 2151.414(B)(1)(d), this extended period of temporary custody provided an alternate basis for the trial court to award permanent custody, and Father does not dispute this finding. Thus, even if the trial court cited an improper basis for its conclusion that J.R. could not or should not be placed with Father within a reasonable period of time, the court made other findings which supported its decision to award permanent custody to GCCS. Thus, the court's judgment was not "contrary to law," as Father contends.

{¶ 13} The first assignment of error is overruled.

### *Discovery Issues*

{¶ 14} In his second assignment of error, Father argues that the trial court erred in failing to allow him discovery related to the GCCS record of the case. As Father notes in his brief, the motion to compel discovery was filed by Mother, not Father, but Father asserts that he is entitled to challenge the court's ruling on appeal because he was "aggrieved by the final order." *See In re C.M.*, 4th Dist. Athens No. 17CA16, 2017-Ohio-

9037, ¶ 48-50 ("an appellant may complain of an error committed against a nonappealing party when the error injuriously affects the appellant."). Without deciding any question of standing, we will address the discovery issue.

{¶ 15} Departments of human services and children services boards are required to keep records and reports of alleged child abuse or neglect, and these records are generally confidential. *See* R.C. 2151.421(I)(1); *State ex rel. Clough v. Franklin Cty. Children Servs.*, 144 Ohio St.3d 83, 2015-Ohio-3425, 40 N.E.3d 1132, ¶ 19. However, the confidentiality of such records and reports is not absolute; a number of exceptions exist. For example, R.C. 5153.17 states:

> The public children services agency shall prepare and keep written records
>
> of investigations of families, children, and foster homes, and of the care,
>
> training, and treatment afforded children, and shall prepare and keep such
>
> other records as are required by the department of human services. *Such*
>
> *records shall be confidential, but * * * shall be open to inspection by the*
>
> *agency, the director of the county department of human services, and by*
>
> *other persons, upon the written permission of the executive secretary.*

(Emphasis added in *Johnson*). *Johnson v. Johnson*, 134 Ohio App.3d 579, 583-84, 731 N.E.2d 1144 (3d Dist.1999).

{¶ 16} Access to such records shall be granted by the executive secretary on a showing of good cause. 1991 Ohio Atty.Gen.Ops. No. 91-003. Good cause is shown "[w]hen it is in the best interests of the child or when the due process rights of other subjects of the record are implicated." *Id.*

{¶ 17} In the context of juvenile court proceedings, Ohio courts have also granted

reasonable access to children services boards' files. *In re: [B]*, 24 Ohio App.3d 180, 493 N.E.2d 1011 (11th Dist.1985) held that, when a children services board is relying on records to gain permanent custody through a dependency action, the board must permit the parent reasonable access to the files of the agency in order to obtain information relevant to the issues before the court; "[a]n agency of the state may not seize a person's child and then be the sole judge [of] how much of the evidence in respect to the agency's conduct it will refuse to divulge." *Id.* at 184. The court held that the confidentiality provision set forth in R.C. 5153.17 was overridden by the parent's fundamental right to a fair trial, that a "judicial evaluation of the availability of the privilege" was necessary, and that counsel for the parent should have had reasonable access to the Children Services' file. (Citations omitted.) *Id.* Similarly, in *Johnson*, the court held that a trial court may conduct an in camera inspection of children services' records or reports related to abuse, and may, under appropriate circumstances, order the disclosure of such records or reports. *Johnson* at 585.

{¶ 18} In this case, Mother filed a motion to compel discovery on November 21, 2016, in which she requested "Children's Services' internal records" so they could be used "to cross-examine the state." On December 15, 2016, the trial court granted the motion to compel, but it stated that, "[i]n lieu of producing the requested documentation to the issuing party, Greene County Children Services shall produce the requested documentation to the Court * * * for an *in camera* inspection to determine whether portion(s) of the Agency's file are discoverable." After the court inspected the GCCS's file, it stated at the beginning of the hearing that the file did "not have any discoverable information." Neither Father nor Mother objected to this finding.

{¶ 19} The records reviewed by the trial court in camera were not made a part of the record. As such, we cannot conduct an independent review of the trial court's determination that the parents were not entitled to access to these records. However, Father argues that he could not effectively refute the caseworkers' testimony about his lack of progress on his case plan without reviewing the case file. However, it is clear from the caseworkers' testimony and from Father's signatures on documents indicating that he received copies of the case plan that he had knowledge of the case plan objectives. Father also had an opportunity to testify concerning any confusion about the case plan and his attempts to comply with it. We are unpersuaded that Father's lack of access to the GCCS file prevented him from presenting evidence about how, in his view, he had satisfied the case plan objectives.

{¶ 20} Father also contends that that he was denied due process because (1) the guardian ad litem apparently had access to the GCCS file, while he did not, (2) the guardian ad litem based her recommendations, at least in part, on the information contained in the file, and (3) the trial court then relied on the "information back channeled from the agency through the [guardian ad litem]" in reaching its decision.

{¶ 21} Although the guardian ad litem's report does state that she had reviewed a variety of materials, including the "CPS" record, the guardian ad litem gathered information from a wide variety of sources, including interviews with teachers, caseworkers, the foster parents, Father, and J.R. The record does not evidence to what extent the guardian ad litem relied exclusively on the GCCS record for her information, if at all. And Father, in his testimony, could have pointed out any disagreements he had with the guardian ad litem's report. Thus, we cannot conclude that Father was

prejudiced by the guardian ad litem's access to the GCCS file.

{¶ 22} The second assignment of error is overruled.

***Evidence Supporting Award of Permanent Custody***

{¶ 23} In his third assignment of error, Father contends that the trial court's decision to grant permanent custody of J.R. to GCCS was against the manifest weight of the evidence.

{¶ 24} The evidence presented at the hearing was as follows:

{¶ 25} J.R.'s foster mother testified that J.R. visits with his father regularly on Sundays. Father is generally available for these visits, but sometimes J.R. does not want to go, and the foster parents allow him to make that choice; sometimes J.R. does not want to deal with the "arguing" at Father's house, and sometimes he does not want to miss out on something that is happening at the foster home. J.R. generally speaks positively about his Father and about his other siblings who live with Father.

{¶ 26} According to the foster mother, J.R. was in the 6th grade at the time of the hearing and had an IEP at school due to developmental delays. He is a "good kid" who is bonded with both of the foster parents and comes to them when he is upset. J.R. enjoys doing home repair projects with his foster father. The foster parents were interested in adopting J.R.; if they were to adopt J.R., they would be open to some continued contact between J.R. and Father.

{¶ 27} The foster parents had not received any financial support from Mother or Father while J.R. was in their care, and the foster parents had not heard from Mother at all for more than a year prior to the hearing.

{¶ 28} Allison Hull was the GCCS caseworker from March 2015, shortly after J.R.

was removed from Father's home, until December 2015. Hull testified that J.R. was removed from his paternal grandparents' home, where he lived with Father, due to "physical hazards." She testified that it was unclear who had custody of J.R. at that point. Father's initial case plan included the following goals: stable housing, employment, visitation with J.R., and parenting classes. However, implementation of the case plan was complicated by the fact that, shortly after J.R.'s removal, Father moved to Indiana with a new girlfriend that he met online. Due to the move, Father's visits were inconsistent, and it was difficult for Hull to help Father with services, although she did attempt to do so.

{¶ 29} Hull testified that J.R. did "very well emotionally and socially and academically" in foster care, where she visited him at least once per month. With respect to school, Hull testified that J.R. was in a "multi-handicapped classroom for intellectually impaired children," had an IEP, received therapy individually and through school, and took medication for attention deficit hyperactivity disorder (ADHD).

{¶ 30} Hull stated her belief that J.R. was bonded with Mother and with his siblings during Hull's involvement with the case (i.e., through December 2015), but he did not seem to be bonded with Father.

{¶ 31} The second caseworker on the case, Kaylee Crawford, worked with J.R. and his family from January through June 2016. She testified that, prior to her involvement, Father had been removed from the case plan because of his lack of participation while living in Indiana. When he returned to Ohio in March 2016, he was added to the case plan with the following goals: mental health assessment and follow through, employment to show an ability to support his children, visitation, and attending

J.R.'s medical and IEP appointments. Placement with the paternal grandparents was also explored during this time, but the condition of their home (from which J.R. was originally removed in March 2015) and the grandmother's failing health precluded such a placement. J.R. could not be placed with Mother because of her drug use and lack of suitable bedding for the child.

{¶ 32} While Crawford was assigned to the case, Father reported to her that he had several job interviews, but he was never employed. Father asserted that transportation was a problem for him with respect to employment, despite Crawford's offers to help him with transportation. Father was staying with a relative, but there was no bed for J.R. at that home.

{¶ 33} Father visited with J.R. at the foster home, and Crawford testified that these visits were "mostly fine"; J.R. complained that Father spent too much time on his cell phone during their visits. With respect to the mental health assessment and follow-up, Crawford testified that Father did not get an assessment while she was working on the case, despite her providing information to him about how and where to do so.

{¶ 34} In sum, Crawford testified that Father "was engaged with" her during the time that she was assigned to J.R's case, but that Father "was not necessarily meeting the case plan objectives" during this time. He did not attend appointments with J.R., did not get employment or a mental health assessment, and did not have housing that could accommodate J.R.

{¶ 35} Amanda Ray was the caseworker from June 2016 through the time of the hearing. Ray testified that J.R. was bonded with his foster parents, had a routine in their home, shared his feelings with them, and helped out around the house. J.R. continued

on an IEP at school and with ADHD medication. The foster parents hoped to adopt J.R.

{¶ 36} With respect to the case plan objectives, Ray testified that Father completed a parenting class in December 2016. He also completed his mental health assessment. The recommendation following the mental health assessment was that Father "contact [the mental health agency] for counseling per his own desire"; Father had expressed an interest to Ray in further counseling, but he had never done so. Father was not employed and had no other income.

{¶ 37} At the time of the hearing, Father lived with his aunt; he had lived there for an extended period, but he did not contribute to or maintain the household. Therefore, according to Ray, Father did not demonstrate that he was able to provide stable, independent housing. Moreover, the aunt's house did not have a room for J.R. The house was also infested with cockroaches, although not to the degree that had caused J.R.'s original removal from his grandparents' house. Father had recently applied for "Greene Met housing," but he was on a waiting list and could remain on the waiting list for months.

{¶ 38} During Ray's time as the caseworker, Father had attended 2 out of 4 or 5 doctor's appointments for J.R.; he had not attended the one IEP appointment. Father's visits with J.R. were inconsistent because he often spent weekends in jail (subject to availability of space) due to an unpaid child support obligation. Father sometimes called the foster family about a visit when he was released from jail on Sundays, but sometimes he did not. Other times, J.R. opted not to have the visit, and Father was not very assertive about following through. Father had missed approximately four of his weekly visits in the two months preceding the hearing.

{¶ 39} Ray testified that Father had made "some progress" on his case plan while she was assigned to the case, but not enough for reunification. She stated:

[Father] only started his case plan objectives for the mental health assessment and the parenting classes once the agency had already filed for permanent custody, so for several months leading up to that I was giving [Father] letters to state where he could sign up for parenting classes, their phone number, address, as well as giving him the information about [a behavioral health services program], their walk-in hours. How he was able to contact them. And then the visitation with [J.R.] wasn't consistent, so that – those continued to be concerns for me.

* * *

There's been an overall lack of consistency and change in [Father's] parenting style with [J.R.]. The consistency with visitation, I got to the point where, you know, I'm giving him letters sometimes twice a month to advise him of services, and he's still not engaging on his own. That becomes a concern.

Not attending [J.R.'s] appointments, not having a full understanding of [J.R.'s] diagnosis and what needs to come about from that, to help [J.R.] with the IEP, things of that nature.

{¶ 40} Based on these concerns and observations, Ray testified that she believed it was in J.R.'s best interest to grant permanent custody to GCCS, with the goal of adoption by the foster family.

{¶ 41} The guardian ad litem submitted a report to the court in December 2016;

she did not testify at trial. The guardian ad litem stated in her report that J.R. seemed well adjusted to his foster home; he plays outside more and is less "skinny" than when he first came to live with them. In some contexts, J.R. expressed openness to adoption by the foster family and talked about a long term relationship with them, such as caring for his foster parents when they were old. But he got upset at the prospect of permanent custody being granted to GCCS when it was explained to him that this meant regular visitation with his father would end. The foster parents were open to adopting J.R. if they could be provided with continued support through GCCS.

{¶ 42} As described by the guardian ad litem, J.R.'s teacher expressed that he did well in school but was "very low cognitively," that his behavior was "very juvenile and distracting," and that he had friends but got upset or felt rejected if his friends "need some space from his clingy behavior." J.R. receives a lot of assistance in his multiple disabilities classroom and needs "basically one on one" attention. The teacher expressed "significant concern" that J.R. will need assistance and services from Greene County MRDD when he is an adult and that he could "fall through the cracks" when he reached age 18, because "while he seems like a typical kid when you first meet him it quickly becomes apparent that his processing isn't there."

{¶ 43} As of the time of the guardian ad litem's report (three months before the hearing), the caseworker reported to her that Father had often been visiting with J.R. one day per week, but that Father had not otherwise been working on his case plan objectives, including that he had not yet completed his mental health assessment, obtained employment, or been attending J.R.'s appointments.

{¶ 44} Father told the guardian ad litem that "everything has fallen apart" since he

was ordered to jail on weekends, because he has a harder time setting up visits with J.R. and has no control. He placed emphasis on his lack of a driver's license in discussing his inability to get a job and to attend J.R.'s appointments, notwithstanding the caseworker's offers to help him with transportation. According to the guardian ad litem, Father seemed hopeless with respect to his likelihood of getting a job without a driver's license.

**{¶ 45}** With regard to J.R.'s wishes about custody, the guardian ad litem stated that J.R. expressed the desire to live with his foster family for "the rest of his life" and continue to visit his father. When the guardian ad litem explained that permanent custody would mean that he would not see his father anymore, J.R. became upset and stated that he wanted to live with Father.

**{¶ 46}** The guardian ad litem recommended that permanent custody be awarded to GCCS.

**{¶ 47}** Finally, Father testified at the hearing. He stated that he had lived with his aunt for six and a half years but was only staying there until he "can actually get on [his] feet." He had applied for housing through Greene Met and looked for housing online. He did not know how long he was likely to be on the waiting list at Greene Met.

**{¶ 48}** Father further testified that he moved to Indiana in 2015 for better job opportunities, and that he got a job when he was there. He also testified that he had been employed at a construction company in Vandalia since "last Monday" and that he had transportation arranged to this employment. He stated that he had completed parenting classes and a mental health assessment, that he visited with J.R. every Sunday unless J.R. chose not to do so, and that he was "getting [his] life back on track." On

cross-examination, Father testified that he has never had custody of J.R. and that he was unfamiliar with J.R.'s school information, such as his teachers' names and his most recent report card grades.

**{¶ 49}** The trial court could have reasonably concluded that Father had not substantially rectified the concerns that formed the basis of his case plan objectives. There had been two extensions of temporary custody (the maximum allowed by statute, R.C. 2151.415(D)(4)), and much of the progress he had made occurred only after GCCS's complaint for permanent custody was filed. Although Father did a good job of maintaining contact with J.R. through visitation, he had not made other meaningful changes in his life or living arrangements. Having thoroughly reviewed the record of this case, we cannot conclude that the trial court abused its discretion or that it erred in concluding that GCCS had proven, by clear and convincing evidence, that an award of permanent custody to GCCS was in J.R.'s best interest and that he had been in the temporary custody of GCCS for 12 or more months of the previous 22 months.

**{¶ 50}** The third assignment of error is overruled.

**{¶ 51}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Nathaniel R. Luken
Carl Bryan
Daniel Getty
Jennifer Lutes
Marcy Vonderwell

Hon. Adolfo A. Tornichio