[Cite as *In re N.C. & A.C.*, 2019-Ohio-567.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: N.C. and A.C.

:
:
:          Appellate Case Nos. 28105 and 28117
:
:          Trial Court Case Nos. 2016-0818 and
:          2016-0819
:
:          (Appeal from Common Pleas Court-
:          Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of February, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384 and SARAH
E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorneys, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301
West Third Street, Dayton, Ohio 45422
    Attorneys for Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
    Attorney for Appellant, Father

SARA M. BARRY, Atty. Reg. No. 0090909, 1139 Holly Avenue, Dayton, Ohio 45410
    Attorney for Appellant, Mother

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} These cases are before us on the appeals of the parents of A.C. and N.C., following judgments terminating their parental rights. To protect the children's privacy, we will use initials for the children's names and will refer to the parents as "Mother" and "Father."

{¶ 2} Father raises the following assignments of error: (1) the trial court abused its discretion by denying Father's motion for a continuance the day of the permanent custody hearing; (2) trial counsel rendered ineffective assistance of counsel; and (3) the trial court erred in granting permanent custody of A.C. and N.C. to Appellee, Montgomery County Department of Job and Family Services – Child Services Division ("MCCS").

{¶ 3} Mother's counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), alleging that counsel found the appeal to be wholly frivolous. We notified Mother and gave her 60 days to file her own pro se brief, but she failed to do so.

{¶ 4} After reviewing the record, we conclude that Father's assignments of error are without merit. We have also performed our duty, under *Anders*, to review the record independently, and we agree with Mother's attorney that no potential assignments of error have arguable merit. Accordingly, the judgment of the trial court will be affirmed.

{¶ 5} For the reasons discussed below, we have also concluded that from this time forward, the Second District Court of Appeals will not accept *Anders* briefs in cases involving termination of parental rights.

I. Facts and Course of Proceedings

{¶ 6} Mother had six biological children, two of whom, A.C. and N.C., were Father's biological children.   Mother also had legal custody of another child (H.H.).

{¶ 7} On February 5, 2016, MCCS filed neglect and dependency complaints in the Montgomery County Juvenile Court concerning A.C. (then age eight) and N.C. (then age five).   According to the complaints, MCCS became involved with Mother in October 2015 because H.H. went to school inappropriately dressed for the weather (she had on only an undershirt and tights despite the chilly weather).   H.H. also had severe head lice.   When MCCS went to Mother's home, Mother was in her car and appeared under the influence. After MCCS told Mother that representatives were there to walk through the home and make safety plans for the seven children, if needed, Mother became upset and left in her car.

{¶ 8} Three children were alone in the home, including A.C. and N.C.   A.C. had not gone to school that day, and N.C. (who was then four years old), was not of school age.   An older child, D.C., was at home and not in school; D.C. often stayed home from school to watch the children.   All three children were very dirty, were dressed in dirty clothes, and had a foul odor.   The conditions of the house were deplorable and unsafe, including no running water in the bathtub, shower, and kitchen, no edible food in the kitchen, rotting food in the refrigerator, and flies everywhere in the house.   In addition, every room had piles of trash and debris, or bags of dirty clothes and trash.

{¶ 9} Mother returned while MCCS was at the house and appeared under the influence of drugs.   She refused to take a drug test and admitted that she would leave the children home alone for days at a time.   Mother agreed to safety plans placing the children outside the home.   Initially, A.C. and N.C. were placed with a non-relative and

were then moved to the home of their stepbrother and his girlfriend. However, these individuals told MCCS at the end of November 2015 that they could not keep the children much longer. There were no known relatives able and willing to take care of the children. Mother was not meeting with MCCS and was not in treatment for mental health or substance abuse issues. In addition, Father was on parole for crimes against Mother and had been convicted of endangering children. He also had not addressed the concerns arising from these convictions. As a result, MCCS filed a complaint for dependency and neglect and asked for temporary custody of the children.

{¶ 10} On February 12, 2016, the magistrate ordered that MCCS be given interim temporary custody. Mother did not appear for the hearing. Father appeared, and counsel was appointed for Father on February 19, 2016. Counsel continued to represent Father during the case until after the permanent custody hearing, which was held in mid-November 2017.

{¶ 11} A semi-annual review report (SAR) was filed on April 22, 2016, indicating that Mother had been avoiding MCCS, that the agency had no address for her, and that she had not complied with recommendations. Following a continuance, a hearing on the neglect and dependency claims was held on May 6, 2016. Father and his attorney appeared for the hearing; Mother did not appear. The magistrate then filed an order finding clear and convincing evidence that the children were neglected and dependent. No objections to the decision were filed.

{¶ 12} Subsequently, a hearing was held on August 19, 2016, at which time the magistrate filed a decision grating temporary custody of the children to MCCS. Father agreed to temporary custody, and Mother again was not present, although her appointed

counsel did attend the hearing. No objections to the decision were filed.

{¶ 13} On October 7, 2016, MCCS filed a motion for a first extension of temporary custody. The affidavit of the caseworker indicated that Mother had made no progress on the case plan and had little, inconsistent contact with the agency. Mother had been ordered to go to a drug screen in July 2016 and did not attend. Mother had no proof of sobriety and did not have stable housing or income sufficient to meet the children's basic needs.

{¶ 14} Likewise, Father had been ordered to go for a drug screen in July 2016 and did not attend. Father had admitted to being on Methadone, Xanax, Prozac, and Lithium, but had provided no proof of the prescriptions and had not named the professional who prescribed them. In addition, Father had refused substance abuse assessments and referrals for parenting classes.

{¶ 15} After a hearing held on December 2, 2016, the magistrate filed a decision finding that an extension of temporary custody was in the children's best interests. Father and his attorney were present; Mother did not appear. At the time Mother had felony drug charges pending and had not been visiting the children. Father's case plan also was not complete, and he agreed to an extension of temporary custody. No objections to the decision were filed.

{¶ 16} In March 2017, MCCS filed a motion and affidavit seeking permanent custody of the children. According to the affidavit of the case worker, Mother had not visited the children in over a year. Mother denied drug abuse but had recently been arrested and charged with possession of heroin and other drug-related charges. Mother did not meet with the caseworker other than when she was incarcerated.

{¶ 17} The affidavit also indicated that Father had been scheduled to visit every Wednesday at the agency. However, due to Father's behaviors, MCCS decided that his visits were to be supervised, beginning in February 2017, but Father had not attended the visits. In addition, Father had not complied with his case plan.

{¶ 18} A hearing was held on April 18, 2017. Father and his attorney were present; Mother was not present. Following the hearing, the magistrate found that Father had voluntarily stopped visiting in mid-January 2017 and Mother had not visited because she was repeatedly incarcerated and her whereabouts were unknown. The children had also expressed fear to the guardian ad litem ("GAL") about Father and had consistently said that they did not want to have contact with Father. Furthermore, the GAL had recommended that visits not be restarted, and MCCS agreed. The magistrate suspended Father's visiting time pending further order of the court and set a hearing for June 15, 2017, at which time the parties were to present information to the court about Father's parenting time. Finally, the magistrate set an in camera interview with the children for May 31, 2017. No objections to this decision were filed.

{¶ 19} On June 15, 2017, the magistrate held a hearing that Father's attorney attended; Father and Mother were not present. In a decision filed after the hearing, the magistrate noted that she had interviewed the children in camera, and they clearly expressed that they did not want to visit either parent. The children also expressed fear of Father based on the past history of domestic abuse and Father's behavior during visits. In addition, the children's therapist, the GAL, and MCCS all recommended termination of visits. After noting these facts and others, including that the children's behavior had improved after Father stopped visiting, and that Mother had been repeatedly arrested in

2017 and had been jailed since June 6, 2017, the magistrate ordered that visits between the parents and children be terminated. No objections to the decision were filed.

{¶ 20} Ultimately, the motion for permanent custody was heard on November 16, 2017. That day, the GAL filed a report recommending that MCCS be granted permanent custody. Both Mother and Father attended the hearing, with their counsel. The GAL was also present.

{¶ 21} At the beginning of the hearing, Father's counsel asked for a postponement because Father was unhappy with counsel's representation. After hearing from Father, the magistrate overruled the request. The magistrate then heard testimony from various witnesses, including a licensed social worker employed by Ohio Mentor Foster Care, who oversaw the foster home of A.C. and N.C. and provided community psychiatric supportive treatment services, the foster mother of A.C. and N.C., two caseworkers, and Mother. Father did not testify.

{¶ 22} After hearing the evidence, the magistrate issued a Magistrate's Decision and Judge's Order on November 20, 2017, granting permanent custody to MCCS. The next day, Father's attorney filed a motion to withdraw as counsel, and the court appointed new counsel for Father. The court also gave Father additional time to file objections to the magistrate's decision. Both Mother and Father filed objections and supplemental objections to the magistrate's decision. Subsequently, in July 2018, the court filed a judgment overruling the objections and granting permanent custody to MCCS. Both Mother and Father appealed from the trial court's decision.

{¶ 23} Mother's counsel filed an *Anders* brief, and Mother did not file a pro se brief upon notice that she was permitted to do so. Father presented three assignments of

error, and we will address those before we consider the *Anders* brief.

II. Denial of Continuance and Ineffective Assistance of Counsel

{¶ 24} Father has combined his discussion of the first two assignments of error, and we will do the same. These assignments of error, in order, are as follow:

The Trial Court Abused Its Discretion by Denying [Father's] Motion for Continuance.

[Father] Was Denied the Effective Assistance of Counsel.

{¶ 25} Under these assignments of error, Father contends that the magistrate abused her discretion by denying his motion for continuance and by failing to inquire what counsel had done to prepare for the hearing. As was noted, Father's attorney asked for a postponement at the beginning of the hearing, stating that Father was not happy with his representation. When the trial court inquired of Father about this, Father said that he had called his attorney several times, with no return phone call, that he had told counsel a month and a half ago that "this is not working and we need to do something," and that he (Father) had "had no representation, been misrepresented from day one." Transcript of Proceedings ("Tr."), pp. 5-6.

{¶ 26} In response, counsel for MCCS noted that when the parties had been in court the last time in September 2017, the parties had agreed to set the matter out until November. As a result, Father had ample opportunity to notify the court of his concerns.

{¶ 27} The magistrate denied Father's request, noting the following matters: Father's attorney had been appointed to represent Father in February 2016; the attorney had appeared on Father's behalf multiple times; he had filed an objection concerning

Father's case plan, which was successful and resulted in a case plan amendment; the matter had been set for trial since September 14, 2017; the request for new counsel, presented the morning of trial, was an unnecessary delay; and there was not such a breakdown in communication that the attorney could not represent Father.

**{¶ 28}** Decisions granting or denying continuances are reviewed for abuse of discretion. *State v. Unger*, 67 Ohio St. 2d 65, 67, 423 N.E.2d 1078 (1981). An abuse of discretion means that the trial court's attitude was "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 29}** The factors to be considered in evaluating continuances include: "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." *Unger* at 67-68.

**{¶ 30}** After reviewing the record, we find no abuse of discretion. As the magistrate noted, the same attorney had represented Father since the beginning of the case, which was 19 months before the final custody hearing. During that time, the attorney appeared at numerous hearings, during which Father had ample opportunity to express dissatisfaction with him and to ask for new counsel. This never occurred. Furthermore, as MCCS noted, the permanent custody hearing that was initially scheduled for September 14, 2017, was continued to a date more than two months later, which gave

Father ample opportunity to request different counsel.

{¶ 31} Furthermore, given that the attorney had prevailed only a few months earlier on Father's objection to MCCS's case plan, the magistrate would have been entitled to view with some skepticism the assertion by Father, made only the day of the final hearing, that his attorney had provided no representation and that Father had been misrepresented from "day one."

{¶ 32} We also note the rule of the Montgomery County Juvenile Court that:

All requests for continuances must be made in writing and filed seven days before the scheduled hearing date. However, the Court may consider a Motion for Continuance that is filed less than seven days before the scheduled hearing date upon demonstration of emergency or for other unforeseen circumstances.

Loc.R. 5.19.3 of the Court of Common Pleas of Montgomery County, Juvenile Division.

{¶ 33} No such emergency or unforeseen circumstances existed. If, as Father asserted, he had been dissatisfied from the beginning of the case, or even a month and a half earlier, his excuse the day of the hearing was not based on unforeseen circumstances. Accordingly, the magistrate did not abuse her discretion in denying the request for a continuance.

{¶ 34} Father's second argument is that his counsel rendered ineffective assistance by ignoring a comment that Father made during the hearing, which would have been useful for cross-examination, by failing to object to a document that contained hearsay, and by failing to call Father or other witnesses to testify.

{¶ 35} "The familiar two-part test for establishing ineffective assistance in criminal

cases is equally applicable in permanent custody proceedings." *In re T.P.*, 2d Dist. Montgomery No. 20604, 2004-Ohio-5835, ¶ 45, citing *Jones v. Lucas Cty. Children Servs. Bd.*, 46 Ohio App.3d 85, 86, 546 N.E.2d 471 (6th Dist.1988). As a result, Father is required to establish that his counsel "provided deficient representation" and that he was prejudiced by the deficient performance. *Id.*, citing *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "In order to establish prejudice, [Father] must show a reasonable probability that but for counsel's deficiencies the result of the proceeding would have been different." *Id.*

{¶ 36} To assess this issue, we have reviewed the entire record, including the trial transcript. At the cited pages of the transcript, Father made comments to his attorney during cross-examination of the social worker who oversaw the foster home where the children lived during the case. The recorder picked up Father's voice, and the magistrate instructed Father to speak to his attorney quietly. Tr. at pp. 26-27. We have reviewed the entire testimony of this witness and can find no relevance of Father's remarks. Father's remarks are also incomplete and unclear and did not even relate to the questions being asked.

{¶ 37} Father's second point concerns counsel's failure to object to admission of a letter that this social worker wrote to MCCS in June 2017. The social worker wrote the letter because the children had been very vocal about not wanting to see their father and dreaded visitation. Tr. at p. 15. A number of things were mentioned, including the fact that Father was angry with the children during visits because they had not called him; that he was mean and cursed a lot; that he was on his cell phone most of the time; that he

showed the children inappropriate pictures on his phone; that he had talked negatively about the foster parents; that he had shown A.C. a picture of a naked woman; and that he would text the foster mother and call her inappropriate names.   *Id.* at pp. 16-17.

**{¶ 38}** However, the court was previously well aware of MCCS's concerns about Father's ability to effectively parent the children.   The initial complaint, which was filed in early February 2016, indicated that Father was on active parole for crimes against Mother, had been convicted of child endangerment, and had not fully addressed the concerns these convictions created.   *See* J.C. Case 2016-0818, Doc. #114, p. 2; J.C. Case No. 2016-0819, Doc. #103, p. 2.[1]   These crimes included 2012 convictions for a third degree felony (domestic violence against Mother, with two prior convictions for domestic violence), and abduction, also a third-degree felony.   *See* Ex. 2; Tr. 88-89.

**{¶ 39}** The case plan noted Father's recent criminal history and required Father to complete a parenting education program and "demonstrate adequate parenting skills including appropriate discipline when visiting with his children."   Doc. #101, Amended Case Plan filed on May 24, 2016, p. 2.   Father was allowed to visit the children a minimum of once a week, for a minimum of two hours, and initially, Father made progress. However, in an affidavit filed with the October 7, 2016 motion for extension of temporary custody, the case worker noted that Father had refused referrals for parenting classes. Doc. #88, Joyce Affidavit, p. 1.

**{¶ 40}** A GAL report filed in December 2016, which recommended continuation of temporary custody to MCCS, reported that Father had shown A.C. photos of Mother both

---

[1] Because two children are involved, the record contains two juvenile court cases with the same pleadings but with different docket numbers.   For convenience, we will refer from now on only to the docket numbers in Case. No. 2016-0818.

before and after drug abuse. The GAL also noted that, due to communication issues with Father, MCCS had not been able to document Father's compliance with his case plan. In addition, Father had said he no longer wished to work with MCCS. Moreover, the children wished to continue visiting with Father, on the condition that visits could be more positive, with less conflict and tension. *See* Doc. #68.

**{¶ 41}** In mid-January 2017, Father voluntarily stopped visiting the children. A semi-annual review (SAR) filed on January 27, 2017, indicated that Father had not demonstrated learned parenting skills, not been consistent in visits, and "discusse[d] inappropriate topics with the boys." Doc. #63, p. 2. This document also noted that there were concerns over Father's "unstable behavior and emotional swings," that Father had not reduced the safety threat to the children over the past year, and that MCCS intended to file for permanent custody. *Id.* at pp. 2-3.

**{¶ 42}** In late March 2017, MCCS filed a motion and affidavit for permanent custody of the children. In the affidavit, an MCCS caseworker stated that due to Father's behaviors, MCCS had decided to supervise Father's visits. The supervised visits were to start in February, but Father had not attended. Doc. # 60, Brown Affidavit, p. 1. After a hearing held on April 18, 2017 (at which Father was present), the court filed a decision suspending Father's visitation pending further order of the court. The court observed that the children had expressed fear to the GAL about Father and had consistently said they did not want contact. The GAL and MCCS also recommended that visitation not be restarted. *See* Doc. #55, p. 2.

**{¶ 43}** A further hearing was scheduled on this issue, and the magistrate interviewed the children in camera on May 31, 2017. In a decision filed on June 15, 2017

(the same day as the hearing), the magistrate stated that the children "clearly expressed that they do not want to visit with either parent. The boys expressed fear of the father based on the past history of domestic violence and based upon father's behavior during visits." Doc. #51 (Magistrate's Interim Order), p. 2. The magistrate further commented that "father voluntarily stopped visiting in January 2017 because he was upset with the Agency and he has not visited since that date." *Id.*

{¶ 44} Based on these facts, the court terminated Father's visitation, and scheduled the permanent custody hearing for September 2017. After a continuance, the hearing was held in mid-November 2017.

{¶ 45} At the permanent custody hearing, the foster mother described the children's reluctance to go see their father, beginning around June 2016. She also said that their behavior improved after the visits stopped. The original caseworker, who was involved from October 2015 to February 2017, indicated that while there were moments of cooperation with Father, he often hung up on her during phone conversations, cursed her out, or made threats about MCCS. The phone calls started out calmly, but Father would then "become angry and agitated and start screaming and yelling and cursing" at her. Tr. at p. 126. The older child (A.C.) also expressed concern and was very uncomfortable and upset about being shown half-naked or entirely naked women on Father's phone.

{¶ 46} In addition, this case worker witnessed Father berating the children when she checked on visits. She heard him telling them things like "If you couldn't tell me what you wanted for dinner next week, then I'll just bring you nothing. If you don't call me, then I'm not going to visit you." *Id.* at p. 102.

**{¶ 47}** The next caseworker was assigned to the case in March 2017. She and her supervisor met with Father in April 2017 to discuss visitation and his case plan objectives. Father said he was not going to take any more parenting classes that they had assigned him because he had already taken two in prison. When this case worker continued to discuss Father's negativity with the kids, he said that he had shown the children pictures of cheerleaders, but had also shown them pictures of football players.

**{¶ 48}** Father refused to address the concern that he was not demonstrating parenting skills and refused to even engage in a conversation about why his children might be afraid of him. Father was adamant that he would parent as he saw fit.

**{¶ 49}** Under the circumstances, even if we assumed that counsel should have objected to the admission of the letter, it was not prejudicial, due to the significant amount of other evidence that Father failed to appropriately parent the children.

**{¶ 50}** Father's final contention is that trial counsel was ineffective because he failed to present testimony from witnesses or from Father. In the context of ineffective assistance of counsel, we have said that " '[h]indsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.' " *In re W.T.*, 2d Dist. Montgomery No. 23427, 2009-Ohio-5409, ¶ 50, quoting *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31. *Accord In re J.D.*, 2d Dist. Montgomery No. 26588, 2015-Ohio-4114, ¶ 80.

**{¶ 51}** The record does not indicate what witnesses Father might have called or what their testimony might have been, and we cannot speculate. Furthermore, while there is no discussion on the record concerning whether Father would testify, counsel

may well have decided, in view of Father's angry outbursts and behavior, and interruption of the court during trial, that his testimony would be harmful. *See* Tr. at p. 7 (interrupting the court); p. 27 (arguing with the court); p. 127 (calling the caseworker a liar); and p. 161 (caseworker expressed concerns about Father's anger management in view of comments she heard Father make outside the courtroom just before the hearing).

**{¶ 52}** Based on the preceding discussion, Father's first two assignments of error are overruled.

### III.   Best Interests of the Children

**{¶ 53}** Father's Third Assignment of Error states that:

The Trial Court Erred in Granting Permanent Custody.

**{¶ 54}** Under this assignment of error, Father first contends that he did not abandon his children.   He next argues that the record fails to show that he could not be reunited with his children within a reasonable time.   Finally, Father asserts a lack of clear and convincing evidence that an award of permanent custody would be in the children's best interests.   According to Father, he substantially complied with his case plan, and testimony about the children's desire not to see him was not fully developed and relied on witnesses who provided only second-hand information.

**{¶ 55}** While parents have recognized and fundamental liberty interests in the care, custody and control of their children, their rights are not absolute.   *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 8 and 11.   The "government has broad authority to intervene to protect children from abuse and neglect."   *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, citing R.C. 2151.01.

{¶ 56} In Ohio, R.C. 2151.414 governs the termination of parental rights. In the cases before us, the magistrate found grounds for termination under R.C. 2151.414(B)(1)(b) and (d), while the trial court focused on R.C. 2151.414(B)(1)(d), but also found pursuant to R.C. 2151.414(E)(10) that the children had been abandoned.

{¶ 57} As pertinent here, R.C. 2151.414(B)(1) provides that "the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: * * * (b) The child is abandoned * * * (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *."

{¶ 58} For purposes of this section, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1)(e). No dispute has been asserted concerning whether R.C. 2151.414(B)(1)(d) applies. The children were removed from Mother's home on October 5, 2015, and MCCS was given temporary interim custody on February 12, 2016. The children were adjudicated dependent on May 11, 2016 (more than sixty days after they were removed from the home), and the motion for permanent custody was filed on March 27, 2017. Using the 60-day measure based on the children's removal from the home, the children were in MCCS's custody (as defined by the statute) for more than 12 months of a consecutive 22-month period. Under this

prong of the statute, the agency does not have to "prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents, so long as the child has been in the temporary custody of an agency for at least 12 months." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21. Nonetheless, the trial court did make such a finding. *See* Doc. #5, p. 16 (indicating the children could not be returned to the parents within a reasonable time due to their failure to remedy the problems that caused removal).

{¶ 59} Where R.C. 2151.414(B)(1)(d) applies, the agency "is only required to prove by clear and convincing evidence, that it is in the best interests of the child to grant permanent custody to the" agency. *In re C.W.*, 2d Dist. Montgomery No. 20140, 2004-Ohio-2040, ¶ 19; *In re R.P.*, 2018-Ohio-517, 105 N.E.3d 737, ¶ 52 (2d Dist.). "Clear and convincing evidence is that measure or degree of proof which * * * will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 60} A "court's decision to terminate parental rights will not be overturned if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re Forrest S.*, 102 Ohio App.3d 338, 344-345, 657 N.E.2d 307 (6th Dist.1995). "We review the trial court's judgment for an abuse of discretion." *Id.*, citing *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 48 (which applied an abuse of discretion standard to the trial court's findings under R.C. 2151.414). After

reviewing the record, we conclude that the trial court did not abuse its discretion and that competent, credible evidence supported the court's decision.

**{¶ 61}** Regarding a child's best interest, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15. "No one element is given greater weight or heightened significance." *C.F.* at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

**{¶ 62}** The trial court considered all of these items in detail and concluded that awarding permanent custody to MCCS was in the children's best interests. We agree.

A.   Interaction and Interrelationship of Children

with Parents and Foster Parents

**{¶ 63}** According to the evidence, A.C. and N.C. resided in the same foster home since they were placed there in February 2016. They were very bonded to the foster parents and had done well there, both behaviorally and academically. Furthermore, as

noted above, the children's fear of Father and desire not to see him was well documented. Both the foster mother and a case worker testified as to what they observed in connection with the children's resistance to visitation, and the case worker also commented about the poor interaction between the children and their father. The children also stated many times to their foster mother, caseworkers, and the GAL that they were afraid of Father and did not want to visit with him. Visits with Father were stopped because of Father's behavior. As a result, R.C. 2151.414(D)(1)(a) weighed in favor of MCCS.

## B. The Wishes of the Children

{¶ 64} As to the children's wishes, they told caseworkers, the GAL, and the court that they wanted to be adopted by the foster parents. *See* Doc. #32, p. 6; *see also* Doc. #37, p. 3 (Report and Recommendations of GAL for September 17, 2017, indicating that children had said they were afraid of Father). The testimony at trial also revealed that the children wanted to be adopted by their foster parents and that they did not want to visit or live with Father. This factor weighed in favor of granting custody to MCCS. *See* R.C. 2151.414(D)(1)(b).

## C. Custodial History

{¶ 65} According to the evidence, the children were temporarily placed with non-relatives and a step-brother, but had lived at the same foster home for the entire case (February 2016 through the date of the hearing in November 2017). Again, the custodial history supported granting custody to MCCS. *See* R.C. 2151.414(D)(1)(c).

## D. The Need for Legally Secure Placement

**{¶ 66}** The trial court discussed the history of the case at length, and with specific reference to Father, noted that Father was on probation for domestic violence and abduction involving Mother. The magistrate, who interviewed the children in camera, indicated that the children had expressed fear of their father based on the past history of domestic violence and based on Father's behavior during visits. In addition, the evidence revealed that the children had witnessed domestic violence and were afraid of Father. During the case, Father minimized anger issues and refused to complete any referrals, claiming that he had addressed the issues during prison. However, the evidence was otherwise.

**{¶ 67}** The trial court noted that Father did not complete his case plan, did not demonstrate his ability to adequately parent the children, did not address MCCS's concerns regarding substance abuse, and voluntarily ceased visits with the children in January 2017. These findings are well-supported in the record and establish that there was no reasonable possibility that Father could provide a legally safe and secure environment for A.C. and N.C. Furthermore, there were no willing or able family placements for the children, even though MCCS made attempts to find them. The foster parents did indicate that they were willing to adopt the children if MCCS were granted permanent custody. The factors in R.C. 2151.414(D)(1)(d), therefore weighed in favor of granting custody to MCCS.

## E. Whether any Factors in R.C. 2151.414(E)(7) to (11) Apply

**{¶ 68}** As noted, the trial court specifically addressed R.C. 2151.414(E)(10), which

requires the court "to enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if the court finds by clear and convincing evidence that "[t]he parent has abandoned the child."

{¶ 69} R.C. 2151.011(C) provides that:

> For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.

This is a rebuttable presumption. *In re Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶ 17. However, Father did nothing to rebut the presumption. As the trial court observed, Father's visitation at first was pretty consistent, but then he was placed on stipulations a number of times due to no-shows. In that situation, Father was required to arrive an hour early. In mid-January 2017, however, Father voluntarily stopped visiting. At that point, he was on a stipulation to arrive for visitation at 4:00 p.m., rather than 5:00 p.m. However, Father refused. He said, "I'm not coming at four o'clock. If my kids don't want to see me, I'm not coming to see them. I'm not coming at four. I'm not leaving work early to do that. So I guess I just won't visit." Tr. at p. 107.

{¶ 70} From that point on, Father did not visit the children. On April 18, 2017 (more than 90 days later), the court suspended Father's visitation, but set the matter for a further hearing in June 2017. The purpose of the meeting was to discuss Father's visitation. However, Father did not appear at that hearing, and the magistrate then terminated Father's visitation. This was based on the recommendation of the GAL, a

therapist, and MCCS, as well as the magistrate's interview with the children, who said that they were afraid of Father based on the past history of domestic abuse and his behavior during visits. The children also said they did not want to visit. Accordingly, competent, credible evidence existed to provide the trial court with the firm conviction that Father had abandoned the children.

{¶ 71} Based on the preceding discussion, the trial court's decision to award custody to MCCS was supported by the evidence and law. Father's Third Assignment of Error, therefore, is overruled.


IV. *Anders* Brief

{¶ 72} As noted, Mother's counsel filed a brief under *Anders*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493, alleging that she had found this appeal to be wholly frivolous. As a possible assignment of error, Mother's counsel suggested the following:

The Finding That Permanent Custody to MCCS Is in the Best Interests of the Children Is Against the Manifest Weight of the Evidence.

{¶ 73} The standard we apply in *Anders* cases is as follows:

We are charged by *Anders* to determine whether any issues involving potentially reversible error that are raised by appellate counsel or by a defendant in his pro se brief are "wholly frivolous." * * * If we find that any issue presented or which an independent analysis reveals is not wholly frivolous, we must appoint different appellate counsel to represent the defendant. *State v. Pullen* (Dec. 6, 2002), Montgomery App. No. 19232.

*Anders* equates a frivolous appeal with one that presents issues

lacking in arguable merit. An issue does not lack arguable merit merely because the prosecution can be expected to present a strong argument in reply, or because it is uncertain whether a defendant will ultimately prevail on that issue on appeal. An issue lacks arguable merit if, on the facts and law involved, no responsible contention can be made that it offers a basis for reversal. *Pullen, supra.*

*State v. Marbury*, 2d Dist. Montgomery No. 19226, 2003-Ohio-3242, ¶ 7-8.

**{¶ 74}** Regarding the evidence about termination of Mother's rights, we note that Mother had not seen the children since they came into MCCS custody in early February 2016. When the children were removed in October 2015, MCCS developed case plan objectives, which remained the same throughout the case; MCCS discussed these objectives with Mother at that time and on other occasions when MCCS was able to contact Mother.

**{¶ 75}** The objectives for Mother were: to have a substance abuse and mental health assessment and follow through with recommendations from the assessment; to obtain and maintain stable, independent housing sufficient to meet the needs of herself and her children; to obtain and maintain legal income sufficient to meet the needs of herself and her children; to visit with the children on a frequent basis; to address past concerns regarding domestic abuse relationships she had had; and to sign releases for information for providers. The main concern was substance abuse.

**{¶ 76}** During most of the case, MCCS was unable to locate Mother. When Mother could be located, she was in jail for drug-related charges, and MCCS was able to speak with her during that time. MCCS gave Mother referrals, but Mother did not follow

up.   MCCS also provided Mother with information about visitation a number of times, but Mother failed to follow up with this, also.   During the case, Mother did not have stable housing or a legal income.   Mother had also had drug convictions during the case, including a conviction of a felony for aggravated possession of drugs.

{¶ 77} In October 2017 (shortly before the permanent custody hearing), Mother appeared at MCCS without an appointment and handed the caseworker a certificate of completion from a parenting class.   However, when the caseworker asked Mother what topics had been covered, Mother refused to divulge them.   Mother asked about visitation at this meeting, but visitation had previously been terminated on June 15, 2017, due to Mother's failure to visit, her repeated arrests in 2017, and the fact that she had been jailed since June 6, 2017.   *See* Doc. #51 (Magistrate's Interim Order) at p. 2.

{¶ 78} In its judgment, the trial court concluded that Mother had abandoned the children, that she had not made substantial progress on case objectives, that the children did not want to see Mother, and that Mother was not in a position to adequately care for the children and had no bond with them.   As a result (and in view of other facts we have already discussed), the court concluded that awarding permanent custody of the children to MCCS was in the children's best interests.   We can find nothing in the record to indicate that argument about the manifest weight of evidence is anything other than wholly frivolous.

{¶ 79} We have independently reviewed the record as required by *Anders*, and we cannot find any potential assignments of error having arguable merit.

V.   Further Use of *Anders* Briefs

**{¶ 80}** The Second District Court of Appeals has permitted *Anders* briefs to be filed in parental termination cases since 1992. *See In re Gober*, 2d Dist. Montgomery No. C.A. 13022, 1992 WL 274680 (Oct. 5, 1992). The Supreme Court of Ohio has never required the use of *Anders* briefs in such cases, and we did not discuss our reasons for doing so in *Gober*. Instead, we simply commented that briefs had been filed by both parents' attorneys pursuant to *Anders*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493. *Id.* at *1. Thereafter, we continued to accept *Anders* briefs in parental termination cases without discussing why we chose to do so.

**{¶ 81}** Even if we had discussed the rule in 1992, circumstances have changed since that time. In March 1999, Ohio's Adoption and Safe Families Act was enacted. This legislation caused the adoption of a new rule (App.R. 11.2), which gave priority to appeals of orders denying or granting adoptions of minors and terminations of parental rights. The emphasis on expedition in these cases runs counter to the length of time *Anders* briefs take to process, especially when arguable issues are found and new counsel must be appointed. Since the new rule was enacted in 2000, we have not reconsidered the use of *Anders* briefs in light of the focus on expedition. Furthermore, the thinking on the use of *Anders* briefs has evolved since our original decision.

**{¶ 82}** We have reviewed the case law in Ohio and find that appellate districts use different approaches. In some districts (the Third, Tenth, and Eleventh Appellate Districts), we found no case law mentioning *Anders* in the context of parental termination or permanent custody. We, therefore, assume these districts do not employ *Anders* briefs in such cases. Other districts specifically do not allow *Anders* briefs or would likely not allow them based on recent decisions these courts have made in the criminal context.

Other districts, like ours, have allowed *Anders* briefs. *See, e.g., In re K.J.*, 5th Dist. Muskingum No. CT2014-004, 2014-Ohio-2132, ¶ 14; *In re K.D.*, 9th Dist. Wayne No. 06CA0027, 2006-Ohio-4730, ¶ 16; *In re K.B.*, 7th Dist. Belmont No. 09 BE 24, 2010-Ohio-1015, ¶ 12.[2]

**{¶ 83}** An example of the way in which thinking has evolved is evident in decisions of the First District Court of Appeals. In a 2009 decision, the First District Court of Appeals stated that:

> * * * Although several Ohio appellate districts, including this court, have allowed counsel appointed in permanent-custody cases to file *Anders* briefs, we have found no analysis of the appropriateness of such a procedure in Ohio. We are persuaded, however, by the reasoning of the Court of Civil Appeals of Alabama, which considered the applicability of *Anders* to a civil custody case and held that *Anders* applies in those cases in which an indigent client has court-appointed counsel. The court reasoned that there was "no practical difference between making counsel continue with [an] appeal, thus requiring counsel to raise frivolous issues that the appellate court has to review, and allowing counsel to file an *Anders*

---

[2] The position taken by the Seventh District in *K.B.* may be invalid due to the court's recent decision in *State v. Cruz-Ramos*, 7th Dist. Mahoning No. 17 MA 0077, 2018-Ohio-1583. In *Cruz-Ramos*, the court held that in criminal cases, appellate counsel may not file a motion to withdraw on grounds that the appeal is frivolous, and counsel must file a merit brief if the client does not wish to dismiss the appeal. *Id*. at ¶ 16. Furthermore, the Sixth District case on which the Ninth District relied in *K.D.* was later overturned by the Sixth District. *See K.D.*, 9th Dist. Wayne No. 06CA0027, 2006-Ohio-4730, at ¶ 16, citing *Morris v. Lucas Cty. Children Servs. Bd.*, 49 Ohio App.3d 86, 86-87, 550 N.E.2d 980 (6th Dist.1989). The Sixth District later reversed its position in *Morris*. See *In re B.H.,* 6th Dist. Lucas No. L-17-1126, 2018-Ohio-1238, ¶ 3.

brief raising possible issues, but notifying the court that counsel believes an appeal would be frivolous." And according to the Alabama court, "if the procedure outlined in *Anders* passes muster in criminal cases, it certainly should be adequate in [a civil custody] context." We agree with these reasons and conclude that court-appointed counsel may file a brief pursuant to *Anders* when, after a thorough review of the record, he is unable to identify arguable assignments of error.

(Footnotes omitted.) *In re D.C.*, 1st Dist. Hamilton No. C-090466, 2009-Ohio-5575, ¶ 3, quoting *J.K. v. Lee Cty. Dept. of Human Resources*, 668 So.2d 813, 815-816 (Ala.App.1995).

{¶ 84} However, in 2013, the First District Court of Appeals changed its position and held that "*Anders* briefs are not appropriate in appeals from judgments terminating parental rights or determining legal custody, and we will no longer accept these briefs in such cases." *In re J.M.*, 1st Dist. Hamilton No. C-130643, 2013-Ohio-5896, ¶ 1. In discussing its reasoning, the court made a number of observations, including these:

We recognize that we have previously allowed *Anders* appeals in civil permanent-custody proceedings. *See In re D.C.,* 1st Dist. Hamilton No. C-090466, 2009-Ohio-5575. Some other Ohio appellate districts have likewise permitted such appeals, though often without extensive analysis. *See, e.g., Morris v. Lucas Cty. Children Servs. Bd.*, 49 Ohio App.3d 86, 550 N.E.2d 980 (6th Dist.1989). But many other states have reached the opposite conclusion, declining to extend *Anders* to termination cases. *See, e.g., N.S.H. v. Florida Dept. of Children and Family Servs.*, 843 So.2d

898, 902 (Fla.2003); *In re Sade C.*, 13 Cal.4th 952, 55 Cal.Rptr.2d 771, 920 P.2d 716 (1996); *A.L.L. v. People*, 226 P.3d 1054 (Colo.2010). Although we have allowed such appeals in the past, we decide today that the *Anders* procedure is not appropriate in permanent-custody cases.

In so holding, we note that the ruling in *Anders* was a limited one, addressing counsel's role in assisting an indigent criminal defendant wishing to appeal a criminal conviction. Accordingly, our local appellate rules explicitly limit no-error briefs to criminal appeals. *See* 1st Dist. Loc.R. 16.2.

*J.M.* at ¶ 11-12.

{¶ 85} While our district does not have a similar local rule on criminal no-error briefs, the First District mentioned other factors that have also recently been discussed in *State v. Wilson*, 2017-Ohio-5772, 83 N.E.3d 942, (4th District). In *Wilson*, the Fourth District Court of Appeals noted that it would no longer accept *Anders* briefs in criminal cases. The factors that were discussed include: prejudice to clients by flagging cases as being without merit; creation of conflicts for appellate counsel, who must choose between duties to their clients and to the court; the heavy burden placed on scant judicial resources; reversal of the role of counsel and courts where courts are put in the position of acting as lawyers; the fact that *Anders* creates a cumbersome and inefficient process; confusion about the scope of review; and the lack of uniform national or state guidelines. *Wilson* at ¶ 10-22; *J.M.*, 1st Dist. Hamilton No. C-130643, 2013-Ohio-5896, at ¶ 11-14.

{¶ 86} In 1989, the Sixth District held that "[a]lthough apparently a case of first impression in Ohio, other states have recognized that the procedures enunciated in

*Anders, supra*, are applicable to appeals involving the termination of parental rights." *Morris*, 49 Ohio App.3d at 87, 550 N.E.2d 980. However, we mentioned in fn. 2, the Sixth District recently changed its mind and said that it was expanding its "prohibition of *Anders* briefs to cases involving the termination of parental rights." *B.H.*, 6th Dist. Lucas No. L-17-1126, 2018-Ohio-1238, at ¶ 3. The court commented that while it had "accepted *Anders* briefs in past permanent-custody cases, we find that this change is both consistent with our local rule, which provides for the filing of 'No-Error Briefs' only in criminal appeals, * * *, and is in the best interests of justice." *Id.* A few months later, the court also decided to prohibit *Anders* briefs in criminal appeals. *See State v. Wenner*, 6th Dist. Sandusky No. S-18-004, 2018-Ohio-2590, ¶ 29 (following the approach taken by the Fourth and Seventh District Courts of Appeals).

{¶ 87} Both R.C. 2151.352 and Juv.R. 4(A) provide a right to counsel for indigent parties involved in proceedings such as parental termination cases. However, the fact that counsel is required does not equate to a right to use *Anders* procedures. Parental termination cases are not criminal cases, and the same constitutional rights that motivated the *Anders* decision are not present. As noted by the Supreme Court, *Anders* was based on the following principle:

In *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963),

the Sixth Amendment's requirement that 'the accused shall enjoy the right

* * * to have the Assistance of Counsel for his defence' was made obligatory

on the States by the Fourteenth Amendment, the Court holding that 'in our

adversary system of *criminal* justice, any person haled into court, who is too

poor to hire a lawyer, cannot be assured a fair trial unless counsel is

provided for him.'   At 344, 83 S.Ct. at 796.   We continue to adhere to these principles.

(Emphasis added.)   *Anders*, 386 U.S. at 742, 87 S.Ct. 1396, 18 L.Ed.2d 493.

**{¶ 88}** Furthermore, after *Anders* was decided, the Supreme Court has stressed that the procedure in *Anders,* (even in the criminal context) "is an alternative, not a constitutional mandate."   *Wilson*, 4th Dist. No. 16CA12, 2017-Ohio-5772, 83 N.E.3d 942, at ¶ 9, citing *Smith v. Robbins*, 528 U.S. 259, 273, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). And finally, as noted, allowing *Anders* briefs can cause undue delay, contrary to the requirement to expedite cases involving termination of parental rights.

**{¶ 89}** Accordingly, from this time forward, our district will no longer allow *Anders* briefs to be filed in cases involving termination of parental rights.

## VI.   Conclusion

**{¶ 90}** All of Father's assignments of error having been overruled, and our independent review having found no potential assignments of error with arguable merit with respect to Mother, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Sarah E. Hutnik
Lucas W. Wilder
Sara M. Barry
Edward Yim
Hon. Helen Wallace